**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Javilo McCULLAH, Defendant–Appellant.**

No. 93–7118.

United States Court of Appeals,
Tenth Circuit.

Feb. 5, 1996.

Gary Peterson, Oklahoma City, Oklahoma (Stephen J. Greubel and Stephen J. Knorr of Office of Federal Public Defender, Tulsa, Oklahoma, with him on the brief), for defendant-appellant.

Robert J. Erickson, Department of Justice, Washington, DC (John Raley, United States Attorney, Sheldon J. Sperling and Paul G. Hess, Assistant United States Attorneys, Muskogee, Oklahoma, with him on the brief), for plaintiff-appellee.

Before SEYMOUR, Chief Judge, ANDERSON and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

This appeal challenges a death sentence imposed under the Anti–Drug Abuse Act of 1988, 21 U.S.C. § 848(e). Defendant-appellant John Javilo McCullah was convicted of drug conspiracy, 21 U.S.C. § 846 (Count 1); conspiracy, 18 U.S.C. § 371 (Count 13); interstate travel with intent to commit murder, 18 U.S.C. §§ 1958, 2 (Count 14); and murder in furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Count 16), and sentenced to death on the capital murder charge. Mr. McCullah appeals both his conviction and sentence on the capital charge as well as his convictions and sentences on other related counts. We af-
firm all of Mr. McCullah's convictions, but we remand the case for resentencing.

*Background*

This case arises from the activities of a large California-based drug organization managed by Joseph "Eddie" Arvizu. The Arvizu organization distributed cocaine and marijuana across the country in trucks. Members of the organization included: Ray Molina, Mr. Arvizu's cousin and confidante; Norwood Hutching, an Oklahoma rancher and businessman who oversaw the cross-country transportation; Tony Wiscowiche, a close confidante of Mr. Arvizu; Thomas "Stimey" Sanchez, a guard and occasional drug courier; and Gabriel Lozano, another guard and courier.

In April 1991, a pickup truck containing nearly 100 kilograms of cocaine was stolen from the Arvizu organization by James Shiew, one of the organization's cross-country drivers. The truck was parked at the Hulbert, Oklahoma, residence of Ruth Ford at the time of the theft. Upon learning of the truck's disappearance, Mr. Hutching launched a search, offering a reward for the truck's recovery. Both Mr. Hutching and Mr. Arvizu questioned Mr. Shiew about the theft, but he skillfully diverted suspicion from himself and instead implicated a man named Avery Rogers. Mr. Rogers, who operated a combination used car lot and pig farm, was a friend of Ruth Ford, from whose residence the truck had been stolen. Mr. Hutching and Mr. Arvizu soon began to suspect that Mr. Rogers and Ms. Ford were behind the theft.

The Arvizu organization, led by Mr. Arvizu himself, set up headquarters in Tulsa, Oklahoma, to oversee the recovery of the stolen drugs. The organization attempted to kidnap Ms. Ford and make her reveal the whereabouts of the drugs, but this plan was thwarted when Ms. Ford refused to open her door.

Mr. Arvizu's next plan involved an attempted kidnapping and torture of Mr. Rogers. This plan was abandoned when one of Mr. Rogers' farm animals began making noise, betraying the kidnappers' presence.

Mr. Arvizu then decided to attempt a roadside ambush of Mr. Rogers. As Mr. Rogers drove home along a wooded road in his truck, a car blocked the road ahead of him while a van blocked the rear. Mr. Molina and Mr. Sanchez emerged from the car and began firing at Mr. Rogers. Mr. Rogers backed his truck off the road out of the ambush and eventually smashed his truck into a tree in the woods. Under cover of the woods, Mr. Rogers returned to his home on foot and notified the police. After the failure of this ambush, Mr. Arvizu and his party returned to California.

Mr. Arvizu continued to plot against Mr. Rogers after his return to California. In May 1991, Mr. Arvizu hired three non-English-speaking Mexican gunmen—"pistoleros"—and had Mr. Wiscowiche drive them to Oklahoma. Meanwhile, Mr. Molina recruited Joe Mendoza and Mr. McCullah in California to assist in the recovery of the stolen drugs. Mr. McCullah, Mr. Molina, Mr. Mendoza, and Mr. Sanchez all drove from California to Oklahoma together in late May.

Mr. Molina's group rendezvoused with the pistoleros at a lake house in Wagoner, Oklahoma. They were joined there by two other Mexican nationals, bringing the total to five: Poncho, Carlos, Juan, Mikey, and Roberto. Mr. Arvizu and Mr. Hutching arrived at the lake house shortly thereafter, the latter bringing a large cache of firearms. Mr. Arvizu and Mr. Hutching then departed the lake house, never to return.

The group remained at the lake house for about two weeks under the supervision of Mr. Molina. During that time, several plans were devised to kill Mr. Rogers. The initial plan, formulated by Mr. Arvizu and Mr. Molina, was to kidnap and torture Mr. Rogers until he revealed the whereabouts of the drugs, then kill him. A second plan, suggested by Mr. Molina, was to go to Mr. Rogers' used car lot and kill everyone there and then to go after Ms. Ford. The plan finally adopted, designed by either Mr. Wiscowiche and Mr. McCullah, or by Mr. Sanchez, Mr. McCullah and Poncho, was to lure Mr. Rogers away from the used car lot and kill him. Mr. McCullah, being the lone non-Hispanic, volunteered to act as the lure, reasoning that he would arouse less suspicion than the others.

The group then undertook the necessary preparatory steps. Mr. Wiscowiche and Mr. McCullah, acting on Mr. Arvizu's instructions, purchased a total of four used vehicles for the operation. At Mr. Molina's direction, Mr. McCullah and Mr. Wiscowiche also purchased ammunition for the various weapons, and Mr. Wiscowiche cleaned the weapons. Mr. Wiscowiche, Mr. McCullah, and Poncho drove around the region and selected an appropriate ambush site. Mr. McCullah, accompanied by Mr. Wiscowiche, reconnoitered the area around the used car lot. Finally, Mr. Wiscowiche attempted to cut the telephone line leading to Mr. Rogers' car lot, but inadvertantly only cut the ground wire.

On June 3, 1991, Mr. McCullah, posing as a prospective customer, met Mr. Rogers' at his used car lot. Mr. Rogers took Mr. McCullah for a test drive in a Pontiac Fiero, driving out to the ambush site. At the conclusion of the test drive, Mr. McCullah stated that he would return later that day, but he failed to do so. Mr. McCullah reported back to the lake house that Mr. Rogers was "going for the bait."

The next morning, Mr. Molina departed for Los Angeles. He gave Mr. Wiscowiche $5000 to distribute among the people remaining at the lake house, with $2000 to go to Mr. McCullah. Mr. Wiscowiche distributed the money as directed.

Pursuant to the ambush plan explained by Mr. McCullah and Poncho, the other participants drove to their assigned places. Mr. McCullah returned to Mr. Rogers' used car lot, chose another car and asked to test drive it. Unable to accompany him, Mr. Rogers asked one of his employees, Jewell Leon Collins, primarily a detail man, to accompany Mr. McCullah on the test drive. Mr. Collins bore no resemblance to Mr. Rogers. Regardless, Mr. McCullah departed the lot with Mr. Collins in a 1975 Chevrolet.

Mr. McCullah drove the Chevrolet to the prearranged ambush site with Poncho and Carlos following them in another car. Mr. Mendoza and Juan were already on-site in another car to pick up the gunmen. Upon

arrival at the ambush site, Mr. McCullah stopped the car and quickly exited the vehicle, leaving Mr. Collins in the vehicle. At the same time Poncho emerged from the trailing car, ran to the Chevrolet, and fired a single shot at point-blank range into Mr. Collins' head, killing him instantly. Mr. McCullah drove away in Poncho and Carlos's car, while Poncho and Carlos joined Mr. Mendoza and Juan in the waiting vehicle. The four drove onto a nearby dirt road and discarded their firearms in the undergrowth.

The entire group except for Mr. McCullah, who apparently returned to California by himself, rendezvoused at a restaurant in Wagoner, Oklahoma, and then proceeded to the Tulsa airport. Mr. Wiscowiche, Carlos and Poncho flew back to Los Angeles, and the others returned by car or bus.

Soon after the murder, the Arvizu organization's drug trafficking operation came under the scrutiny of California law enforcement officials. As the investigation progressed, some members of the organization, including Mr. Lozano, Mr. Wiscowiche and Mr. Shiew, were persuaded to come forward and cooperate with the investigation. This allowed the FBI to piece together what happened in Oklahoma and led to the eventual arrest and 29–count superseding indictment of Mr. McCullah, Mr. Molina, Mr. Mendoza, Mr. Sanchez, and Mr. Hutching. Mr. Arvizu fled to Mexico in January 1992 and has not been seen since. Before the trial began, Mr. Mendoza negotiated a plea bargain in return for his cooperation and trial testimony.

After a one month trial, the jury found Messrs. Molina, Sanchez and McCullah guilty on all counts with which they were charged, respectively, and Mr. Hutching guilty on all counts except counts 26 and 27. The government sought the death penalty against Messrs. Hutching, Molina and McCullah. The jury separately considered the death penalty for each defendant, beginning with Mr. Hutching, then Mr. Molina, and finally Mr. McCullah. The jury rejected the death penalty as to Mr. Hutching and Mr. Molina, but sentenced Mr. McCullah to death.

Mr. McCullah filed a timely notice of appeal, alleging numerous errors in both the guilt and penalty phases of his trial.

## Discussion

### Guilt Phase Challenges

### I. Assistance of Counsel

Mr. McCullah claims that the district court committed multiple errors in its provision of counsel for him. Mr. McCullah argues that two counsel were not properly appointed, that his counsel were not "learned in the law", and that his counsel operated under a conflict of interest. The construction of statutes regarding the appointment of counsel in capital cases is a legal question subject to *de novo* review. *United States v. Walker*, 947 F.2d 1439, 1441 (10th Cir.1991). The trial court's ruling on whether to appoint additional counsel beyond those required by statute is reviewed for an abuse of discretion. *United States v. Steel*, 759 F.2d 706, 710 (9th Cir.1985). The trial court's determination regarding a conflict of interest is subject to *de novo* review. *United States v. Martin*, 965 F.2d 839, 841 (10th Cir.1992). Subsidiary factual findings concerning the disqualification of an attorney are reviewed for clear error. *Martin*, 965 F.2d at 841; *United States v. Collins*, 920 F.2d 619, 628 (10th Cir.1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991).

### A. Appointment of Counsel

Under 18 U.S.C. § 3005, the defendant in a capital case is entitled, upon request, to the appointment of two defense counsel. 18 U.S.C. § 3005. In this case, the trial court actually appointed only one lawyer, the Federal Public Defender, to represent Mr. McCullah. However, Mr. McCullah failed to object on this ground below, so his claim is reviewable only for plain error. *United States v. Olano*, 507 U.S. 725, 730–32, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

Before and during the trial Mr. McCullah was represented by Mr. Greubel and Mr. Bryant, both of the Federal Public Defender's office. Only Mr. Bryant was identified as Mr. McCullah's appointed counsel in the docket sheet, but the court was informed that

both Mr. Greubel and Mr. Bryant would jointly represent Mr. McCullah. Although no formal appointment was entered designating Mr. Greubel as Mr. McCullah's counsel, this clerical oversight does not amount to plain error. *See* Fed.R.Crim.P. 52(b). Mr. McCullah has failed to make any showing that the lack of a formal appointment affected his representation or his substantive rights.

■ Mr. McCullah also claims that the trial court erred in failing to appoint additional counsel for him at his request. The trial court denied Mr. McCullah's motion for additional counsel, finding that "[t]he defendant has very adequate representation by experienced trial counsel...." While this was a complex and difficult case, the trial court found Mr. McCullah's two counsel up to the task, and in light of the record we cannot say that this finding is clearly erroneous. *Cf. Collins,* 920 F.2d at 628. Thus, we find that the trial court did not abuse its discretion in declining to appoint additional counsel. *See Steel,* 759 F.2d at 710.

### B. Learned in the Law

■ Under 18 U.S.C. § 3005 as it existed at the time of Mr. McCullah's trial,[1] a capital defendant is entitled to "counsel learned in the law." 18 U.S.C. § 3005 (1982). Mr. McCullah argues that the phrase "learned in the law" requires that counsel have prior capital punishment experience. We disagree.

The plain meaning of the phrase "learned in the law" refers to a person who has received a regular legal education, generally signified by admission to the bar. *See* Black's Law Dictionary 889 (6th ed. 1990). The plain meaning of the phrase does not imply any specialized death penalty experience. If Congress intended that counsel be learned in the law applicable to capital cases, it could have so stated, which it did when it amended the statute in 1994. *See* 18 U.S.C. § 3005. Despite Mr. McCullah's contention to the contrary, the 1994 amendment did not merely "clarify" the law but rather substantively changed it, creating a new requirement which previously had not existed.

1. This part of the statute was amended in 1994.

Further evidence that the former § 3005's "learned in the law" requirement referred only to law generally is found in 21 U.S.C. § 848(q)(5). Under 21 U.S.C. § 848(q)(5), enacted in 1988, a capital defendant is entitled to at least one attorney who has been admitted to practice for at least five years and has at least three years' experience in the actual trial of felony prosecutions. *Id.* If the former § 3005's "learned in the law" requirement referred to capital punishment experience, as Mr. McCullah contends, Congress would hardly have created a special expertise requirement framed in terms of "felony prosecutions" in a later statute.

Mr. McCullah's counsel were both experienced public defenders who had been admitted to practice for ten years. While they may have lacked capital punishment experience, Mr. McCullah does not challenge their general practice or felony litigation credentials. We find that Mr. McCullah was properly represented by counsel "learned in the law" under the former Section 3005.

### C. Conflict of Interest

■ Mr. McCullah contends that his Sixth Amendment right to counsel was violated because of a conflict of interest on the part of his counsel. Rodger Emberson, a prospective government witness, was being represented by Mr. Nigh, another assistant in the same federal public defender office that represented Mr. McCullah. Mr. McCullah argues that this representation disqualified all members of that federal public defender office. He further contends that the prospect of Mr. Emberson's trial testimony threatened Mr. McCullah's counsel's professional judgment on behalf of Mr. McCullah.

■ The mere possibility of a conflict of interest "is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). "Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests'...." *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). However, where the defendant makes a time-

ly objection pointing out a conflict of interest, prejudice is presumed if the trial court fails to make an adequate inquiry into the situation and take appropriate steps. *Selsor v. Kaiser,* 22 F.3d 1029, 1032–33 (10th Cir.1994) (citing *Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 1178–79, 55 L.Ed.2d 426 (1978)).

The trial court made adequate inquiry and found that no conflict existed, especially after it determined that Mr. Emberson's testimony would not be admissible.[2] Mr. McCullah has failed to demonstrate an actual conflict on the part of his counsel, nor has he adequately shown any adverse effects. There is no evidence suggesting that privileged information was shared between Mr. McCullah's counsel and Mr. Nigh. Mr. Nigh's representation of Mr. Emberson may have disqualified Mr. Nigh from also representing Mr. McCullah, but it was not Mr. Nigh who represented Mr. McCullah. Mr. McCullah was represented by other attorneys in the same federal public defender office, not by the same attorney as Mr. Emberson. *Accord United States v. Trevino,* 992 F.2d 64, 66 (5th Cir.1993) ("The potential for such conflicts, however, does not necessarily exist when ... codefendants are represented by different attorneys, albeit in the same public defender office").

Even assuming that a potential conflict existed, that conflict never materialized because Mr. Emberson was not allowed to testify at Mr. McCullah's trial. *See United States v. Dressel,* 742 F.2d 1256, 1260 (10th Cir.1984) (because "conflicted" witness never testified, defendant's attorney was not prevented from cross-examining a government witness). *Accord Wycoff v. Nix,* 869 F.2d 1111, 1117 (8th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989) (no actual conflict because "conflicted" witness did not testify). Mr. McCullah claims that the spectre of Mr. Emberson's testimony may have affected his counsel's professional judgment on his behalf, but we find that this "conflict" is too speculative and hypothetical to impugn his conviction. The record reveals that the trial court assessed the risk of con-

flict and properly determined that disallowing Mr. Emberson's testimony adequately eliminated any risk.

## II. Voir Dire

Mr. McCullah contends that the trial court erred in failing to remove prospective juror Dehart, a prison guard at a state minimum security prison, for cause, forcing Mr. McCullah to use one of his peremptory challenges to remove him. The trial court's decision to refuse a for-cause dismissal is reviewed only for clear abuse of discretion, *United States v. McIntyre,* 997 F.2d 687, 697 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994), although review of legal questions, such as the statutory qualifications for jurors, is *de novo, see United States v. Protex Indus., Inc.,* 874 F.2d 740, 743 (10th Cir.1989).

Under 28 U.S.C. § 1863(b)(6)(B), members of the fire or police departments of any State are barred from jury duty. 28 U.S.C. § 1863(b)(6)(B). Mr. McCullah seeks to equate "prison guard" with "police officer", relying on an Oklahoma statute which invest prison guards with the powers of "peace officers" and another statute which defines "police officer" and "peace officer" similarly. *See* 57 Okla.Stat. § 510(3); 21 Okla.Stat. § 648(A). Mr. McCullah's interpretation of § 1863(b)(6)(B) goes against the plain language of the statute which clearly refers to only "police officers", a specific, narrow category of persons. *See* 28 U.S.C. § 1863(b)(6)(B). While prison guards may have some police-like duties, they are not members of the police department. Had Congress intended to exclude a broader class of persons from jury service, it could have simply used a broader term, such as "law enforcement officer." The fact that the state of Oklahoma may, in certain instances, consider prison guards officers of the law, *see Snyder v. State,* 738 P.2d 548, 550 (Okla. Crim.App.1987) (corrections officers within scope of statute prohibiting assaults on police officers), does not alter § 1863(b)(6)(B)'s defi-

---

2. The record reveals that the trial court thought that any possibility of conflict was mooted by

denying Mr. Emberson's testimony. 31 R. 2334.

**1100**

nition of "police officer" to include prison guards.

■ "Generally, a court must grant a challenge for cause if the prospective juror's actual prejudice or bias is shown." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1467 (10th Cir.1994). The trial court and counsel thoroughly examined prospective juror Dehart regarding his employment as a prison guard and any potential bias or prejudice his employment might cause. We agree with the Second and Seventh Circuits that "a trial court 'is not required to excuse any juror on the basis of his occupational background so long as the court is able to conclude that the juror would be able to view the evidence and decide the case without bias.'" *United States v. Nururdin*, 8 F.3d 1187, 1191 (7th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1328, 127 L.Ed.2d 676 (1994) (quoting *United States v. Maldonado–Rivera*, 922 F.2d 934, 970–71 (2d Cir.1990)). Dehart stated that he believed himself to be fair and impartial and that he had no fixed opinion about inmates or criminals. Thorough questioning by the trial court and counsel failed to reveal any bias; therefore, the trial court did not abuse its discretion in not removing prospective juror Dehart for cause. *Accord Nururdin*, 8 F.3d at 1190–91 (four potential jurors related to law enforcement were not dismissed for cause); *United States v. McCord*, 695 F.2d 823, 828 (5th Cir.), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1533, 75 L.Ed.2d 953 (1983) ("[O]ne's official position as a member of the law enforcement community does not require a court in the exercise of its discretion to excuse a juror for cause where the juror has stated that he or she could remain impartial").

### III. Coerced Statements

Mr. McCullah claims that the trial court erred in admitting statements coerced from him by a government agent. Mr. Lozano, in cooperation with the FBI, staged a monitored conversation with Mr. McCullah. Mr. Lozano, a former Arvizu employee, took Mr. McCullah on a long drive into the mountains. Before the drive was underway, Mr. Lozano gave Mr. McCullah approximately twenty dollars, which Mr. McCullah claims he used to purchase heroin which he used immediately. During the three-hour drive, Mr. Lozano told Mr. McCullah that the Arvizu organization was planning to kill him because of the fiasco in Oklahoma and offered to intercede with Arvizu on Mr. McCullah's behalf provided that he tell him the truth about the events in Oklahoma. Mr. McCullah proceeded to tell Mr. Lozano about the happenings in Oklahoma, discussing the small sum he was paid and expressing his willingness to go back to Oklahoma and do the job himself. Later in the conversation, Mr. McCullah grew frightened of Mr. Lozano, seeming to believe that Mr. Lozano may have been the one assigned to kill him.

Mr. McCullah moved to suppress his statements to Mr. Lozano at trial on the basis that the statements were involuntary due to the influence of drugs and due to the government's "outrageous" conduct in obtaining the statements. Contrary to the government's assertion that Mr. McCullah raised only the intoxication issue, the issue of governmental conduct, including Mr. Lozano's threats, was adequately, if ineloquently, raised by Mr. McCullah's allegation of "outrageous" conduct. The trial court treated the two grounds as distinct and addressed them separately. The trial court denied Mr. McCullah's motion, finding that any drug use was voluntary and that the government's other conduct fell within the "wide latitude" given to the government in criminal investigations.

■ The voluntariness of a confession is a legal question subject to review *de novo* based on the entire record. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987). Subsidiary factual findings are subject to review under the clearly erroneous standard. *Id.* at 1307–08. The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972). If a coerced statement is admitted in error, reversal is required unless the Government can show that the error was harmless beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 295–96, 111 S.Ct. 1246, 1257–58, 113 L.Ed.2d 302 (1991).

■ A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and "his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). In determining whether the defendant's will was overborne in a particular case, the court examines "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226, 93 S.Ct. at 2047.

■ The circumstances in this case are substantially similar to those in *Arizona v. Fulminante.* In *Fulminante,* the defendant, a prison inmate at the time, was approached and befriended by another inmate who was a FBI informer. The informer told the defendant that he knew the defendant was starting to get some rough treatment from other inmates and offered to protect the defendant from other inmates if the defendant gave him the full facts of the alleged crime. The defendant then made incriminating admissions which were used against him at trial.

The Supreme Court held that the defendant's statements in *Fulminante* were coerced. *Fulminante,* 499 U.S. at 287, 111 S.Ct. at 1252–53. "[C]oercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *Id.* Similarly, in this case, Mr. McCullah's statements to Mr. Lozano were coerced by a credible threat of violence. Mr. Lozano told Mr. McCullah that the Arvizu organization was out to kill him, a credible threat coming from a former member of the organization. As in *Fulminante,* Mr. Lozano offered to intercede to protect Mr. McCullah from the threat if Mr. McCullah confessed. Indeed, this case presents a stronger example of coercion than *Fulminante* because in this case Mr. Lozano fabricated the threat to Mr. McCullah.

Mr. McCullah also claims that his statements to Mr. Lozano were rendered involuntary by Mr. McCullah's alleged heroin use at the time of the statements. While any drug use may have made the coercion more effective, *see United States v. Haddon,* 927 F.2d 942, 946 (7th Cir.1991), we need not reach this issue because we find that regardless of whether Mr. McCullah's resistance was weakened by drugs at the time, the threat and offer of protection by Mr. Lozano clearly coerced Mr. McCullah's statements.[3]

■ The erroneous admission of a coerced confession is subject to harmless error review. *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265. "When reviewing the erroneous admission of an involuntary confession, the appellate court ... simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Id.* The Supreme Court has stated:

A court must approach [the harmless error issue] by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [coerced confession].

*Yates v. Evatt,* 500 U.S. 391, 404–05, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). Reviewing the evidence against Mr. McCullah, we find that there was overwhelming evidence to convict Mr. McCullah of the crimes charged even in the absence of his coerced statements. The coerced statements mainly pertained to Mr. McCullah's actions in Oklahoma, and the record is replete with a tremendous amount of other evidence as to Mr. McCullah's actions in Oklahoma. Evidence of fingerprints together with the testimony of several witnesses placed Mr. McCul-

***

3. We note that a state of intoxication does not automatically render a statement involuntary. *United States v. Muniz,* 1 F.3d 1018, 1022 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993). Further, any drug use was completely voluntary on Mr. McCullah's part and not the product of government action. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). The coercion in this instance came not from the alleged drugs but from Mr. Lozano's statements.

lah in Oklahoma at the lake house and at the homicide scene. Several witnesses testified to Mr. McCullah's pivotal role in both the planning and execution of the murder, as well as to the payment he received. We find that with regard to Mr. McCullah's convictions, the admission of Mr. McCullah's statements to Mr. Lozano was harmless beyond a reasonable doubt. *Id.* at 405, 111 S.Ct. at 1893–94.

Having concluded that the use of the coerced statements was harmless error in the guilt phase does not end our inquiry in this case. We must next consider the effect, if any, of these coerced statements on the penalty phase. Mr. McCullah's coerced statements were prominently featured by the government in the penalty phase of the trial. Mr. McCullah's statements regarding the paltry sum he received for the murder and his offer to go back and do the job himself were the only evidence of his unrepentance. These statements were emphasized by the government, and we cannot say beyond a reasonable doubt that these remarks may not have influenced the jury in their findings of aggravating and mitigating factors, as well as affecting the weighing process itself. There was no evidence of Mr. McCullah's willingness to murder again other than these coerced statements. Mr. McCullah's statements may have had a significant impact on the penalty phase decision of the jury, and we cannot say that the admission of Mr. McCullah's coerced statements was harmless error during the penalty phase of the trial. Accordingly, we remand for a new penalty phase proceeding.

### IV. Sufficiency of the Evidence

Mr. McCullah challenges his convictions, claiming that they are not supported by sufficient evidence. In reviewing the sufficiency of evidence supporting a conviction, we examine the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the government and " 'ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Levine,* 41 F.3d 607, 610 (10th Cir.1994) (quoting *United States v. Arutunoff,* 1 F.3d 1112, 1116 (10th Cir.1993)). "We consider both direct and circumstantial evidence and accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." *Levine,* 41 F.3d at 610.

### A. Homicide

Mr. McCullah was convicted under 21 U.S.C. § 848(e)(1)(A), which refers to intentional homicides committed by "any person ... working in furtherance of a continuing criminal enterprise." *See* 21 U.S.C. § 848(e)(1)(A). Mr. McCullah contends that his conviction on this count should be overturned because he lacked the knowledge needed to "work in furtherance of" the Arvizu criminal enterprise and because the killing of Collins was not in furtherance of the organization's objectives. We find both of these reasons unpersuasive.

#### i. Knowledge of the enterprise

Section 848 does not define the phrase "working in furtherance of." *See* 21 U.S.C. § 848 (section 848(c) defines "engaging in"). Absent any statutory definition, terms should be given their ordinary meaning. *United States v. Cooper,* 19 F.3d 1154, 1165 (7th Cir.1994). Mr. McCullah contends that "working in furtherance of a continuing criminal enterprise" should be defined with reference to the law of conspiracy and seeks to impute the knowledge requirement of conspiracy law to § 848(e).

While knowledge of the nexus between the homicide and the continuing criminal enterprise is necessary under § 848(e), the defendant need not be a "conspirator" nor have full knowledge of the objectives or extent of the continuing criminal enterprise in order to be "working in furtherance of" the enterprise. *Cf. Cooper,* 19 F.3d at 1164–65; *United States v. Chandler,* 996 F.2d 1073, 1096 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994). The evidence presented at trial indicated that Mr. McCullah knew that the planned murder was being carried out on behalf of the Arvizu drug organization and knew that the murder was being committed to further the organization's criminal objectives. This knowledge suffices to make Mr.

McCullah's actions "working in furtherance of" the Arvizu continuing criminal enterprise. The fact that Mr. McCullah was not engaged in the drug trafficking portion of the Arvizu criminal enterprise is irrelevant; the reach of section 848(e) extends to hired henchmen, like Mr. McCullah, who commit murder to further a drug enterprise in which they may not otherwise be intimately involved.[4]  *Cooper,* 19 F.3d at 1164–65.

### ii. "In furtherance" of the enterprise

The fact that the intended victim, Avery Rogers, was not the person actually killed does not mean that the murder was not "in furtherance" of the Arvizu enterprise. The murder of Mr. Collins may have actually furthered the Arvizu organization by sending a powerful message to Mr. Rogers and others that the organization would stop at nothing to recover its stolen drugs. To the extent that fear is a powerful element of the Arvizu enterprise, the murder of Mr. Collins likely furthered the organization's image and reputation.

▮ Further, a murder may be committed "in furtherance" of a continuing criminal enterprise even though it does not actually further the enterprise's goals. *Cf. United States v. Mayes,* 917 F.2d 457, 464 (10th Cir.1990), *cert. denied,* 498 U.S. 1125, 111 S.Ct. 1087, 112 L.Ed.2d 1192 (1991) ("in furtherance" does not require actual furtherance of the conspiracy but rather an intent to promote conspiratorial objectives). The key factor is that the murder was designed and intended to further the enterprise, notwithstanding any failure to fulfill that goal.

Mr. McCullah contends that the murder of Mr. Collins was not intended by the Arvizu organization but by Mr. McCullah alone and thus was not "in furtherance" of the continuing criminal enterprise. This is too narrow a view of "in furtherance." The murder of the wrong victim is still in furtherance of the criminal enterprise because the crime, as planned by the Arvizu organization, was designed to further the enterprise. The fact that the crime did not go as planned—that Mr. McCullah took it upon himself to substitute the victim—does not alter the fact that the murder was aimed at furthering the enterprise.

The fact that the actual victim was not the intended victim is irrelevant to the statute. Section 848(e) is not victim-specific but rather refers broadly to "the intentional killing of an individual." *See* 21 U.S.C. § 848(e)(1)(A). As long as the required nexus between the murder and the continuing criminal enterprise is established, the identity of the actual victim matters not.

### B. Drug Conspiracy

▮ Mr. McCullah was convicted of conspiring to possess and distribute marijuana and cocaine in violation of 21 U.S.C. § 846. Mr. McCullah contends that there was insufficient evidence linking him to the drug conspiracy and that he merely associated with the conspirators. We disagree.

▮▮ A person "must have a 'general awareness of both *the scope* and *the objective* of the enterprise to be regarded as a coconspirator.'" *United States v. Anderson,* 981 F.2d 1560, 1563 (10th Cir.1992) (emphasis in original) (quoting *United States v. Evans,* 970 F.2d 663, 670 (10th Cir.1992)). In order for there to be a conspiracy, there must at some point be a meeting of the minds as to the common purpose of the conspiracy. *Anderson,* 981 F.2d at 1563.

The government concedes that there was no evidence that Mr. McCullah actually trafficked in drugs for the Arvizu organization, but the evidence did indicate that McCullah was affiliated with the organization and participated in one of the organization's key drug-related operations, namely the recovery of the stolen drugs and the punishment of the drug thieves. Contrary to Mr. McCullah's assertions that he merely associated with the members of the Arvizu organization,

---

4.  Similarly, outside "hitmen" hired by a continuing criminal enterprise are subject to prosecution under § 848(e), provided that they know the are working to the benefit of a criminal enterprise. It is inconsequential that the hitmen may not otherwise be involved with the organization; so long as they realize that they are working to further such an enterprise, they are subject to § 848(e).

the evidence indicates Mr. McCullah took an active part in the planning of the drug-related operation.

Mr. Mendoza testified that Mr. McCullah helped with the plan to kidnap and torture Avery Rogers, then helped to change that plan and to formulate the new plan to murder Mr. Rogers, and that Mr. McCullah volunteered to draw Mr. Rogers out. Mr. McCullah's active involvement in the operation to recover the stolen drugs leads to the reasonable inference that Mr. McCullah was part of the conspiracy to distribute the drugs, once recovered. Far from being a complete outsider, Mr. McCullah was familiar with the Arvizu organization and understood the objectives of the conspiracy; Mr. McCullah understood that the murder of Rogers was not an end in itself but rather was part of the Arvizu organization's larger drug distribution operation. *See id.* The jury could reasonably infer from the evidence that there was a meeting of the minds between Mr. McCullah and the others as to a general awareness of the scope and the objective of the Arvizu drug conspiracy, and this sufficiently supports the jury's verdict on the drug conspiracy charge. *Id.*

### C. Conspiracy to, and violation of, 18 U.S.C. § 1958

Mr. McCullah was convicted of "travel ... in interstate ... commerce ... with intent that a murder be committed ... as consideration for a promise or agreement to pay" in violation of 18 U.S.C. §§ 1958(a), 2. Mr. McCullah was also convicted of conspiracy to violate 18 U.S.C. § 1958(a), in violation of 18 U.S.C. § 371. Mr. McCullah contends that there was insufficient evidence to support his conviction on these counts. We disagree.

The government concedes that there is no direct evidence that Mr. McCullah knew of the murder plan at the time of the interstate travel, but from the evidence the jury could reasonably infer that Mr. McCullah was knowingly recruited in California to participate in a murder in Oklahoma. The evidence revealed that the Arvizu organization had already decided to murder Rogers before they recruited Mr. McCullah and that Mr.

McCullah was specifically recruited to participate in the drug recovery and murder scheme. The other recruits—Mr. Mendoza and the Mexican pistoleros—all knew the purpose of the trip to Oklahoma was to eliminate the drug thief. The jury could reasonably infer that Mr. McCullah, too, must have known the purpose of the trip; indeed it would be difficult to hide the purpose from him even had they wanted to. Mr. McCullah knew that he was "to do a job for Ray [Molina]", 21 R. 51, and presumably, he knew what that job was before he undertook it. In light of all the evidence, the jury could reasonably infer that Mr. McCullah must have known about the homicidal purpose behind the trip from California to Oklahoma before he undertook the venture, and thus the convictions under 18 U.S.C. §§ 1958, 371 are sufficiently supported by the evidence.

### V. Drug Conspiracy Conviction

Mr. McCullah challenges his drug conspiracy conviction, claiming that this count is a lesser included offense in his § 848(e) murder conviction and that the drug quantity used for sentencing under the drug conspiracy conviction was erroneous. Mr. McCullah failed to raise either of these claims in the district court, so we review only for plain error. *See* Fed.R.Crim.P. 52(b).

### A. Multiplicity with Homicide Count

Generally, a conspiracy charge and a substantive charge are separate offenses, and one offense is not a lesser included offense of the other. *See United States v. Horn,* 946 F.2d 738, 744–45 (10th Cir.1991). The situation is even more clear where the substantive offense is not the object of the conspiracy. In this case, Mr. McCullah was convicted of drug conspiracy under § 846 and capital murder under § 848(e). The conspiracy charge is separate and distinct from the murder charge, not a lesser included offense.

A violation of § 848(e) requires that the murder be committed by a person "engaging in or working in furtherance of a continuing criminal enterprise." 21 U.S.C. § 848(e)(1)(A). A violation of § 846 requires that a person "attempt or conspire" to com-

mit a drug offense. 21 U.S.C. § 846. Mr. McCullah seeks to equate the continuing criminal enterprise requirement of § 848(e) with conspiracy, claiming that furtherance of a continuing criminal enterprise necessitates participation in a conspiracy. However, as we discussed *supra*, a person may further a continuing criminal enterprise without necessarily being a full member of the underlying conspiracy.

Reliance on *United States v. Stallings*, 810 F.2d 973 (10th Cir.1987), is misplaced. In *Stallings*, the defendant was charged with engaging in a continuing criminal enterprise as well as conspiracy, but the conspiracy alleged was the continuing criminal enterprise. By contrast, here the continuing criminal enterprise requirement is part of a greater offense, capital murder, which is separate from the drug conspiracy charge.

█ Further, we note that under *Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679–80, 74 L.Ed.2d 535 (1983), Congress could specifically authorize cumulative punishment under two statutes even if both statutes prohibit the "same" conduct. Congress has clearly expressed its intention that the § 848(e) punishment be cumulative with any other applicable punishment, stating in the statute that the § 848(e) penalties are "[i]n addition to the other penalties set forth in this section." *See* 21 U.S.C. § 848(e)(1). Thus, even if we found the offenses duplicative, cumulative sentences would still be appropriate.

### B. Drug Quantity

█ Mr. McCullah was sentenced on the drug conspiracy count based on the size of the 91 kilogram cocaine shipment which the conspiracy sought to recover. *See* U.S.S.G. 2D1.1(a)(3). He challenges this drug quantity, contending that this quantity was not reasonably foreseeable by him and thus cannot be used in sentencing him. Mr. McCullah failed to raise this issue below, and again we review only for plain error and find none.

Mr. McCullah contends that there was no evidence that he knew about the stolen drugs in Oklahoma or that he knew the drugs weighed 91 kilograms. However, the evidence showed that he was aware that the purpose behind the planned kidnapping and murder of Avery Rogers was the recovery of a quantity of drugs. The fact that Mr. McCullah did not know the exact amount is irrelevant; Mr. McCullah was an active participant in a conspiracy to recover and distribute 91 kilograms of cocaine, and thus this amount is properly attributable to him in sentencing. *See United States v. Robertson*, 45 F.3d 1423, 1444–45 (10th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 133, 133 L.Ed.2d 81 (1995).

Mr. McCullah contends that the drug quantity must be "reasonably foreseeable," relying on Sentencing Guideline § 1B1.3(a)(1)(B). *See also Robertson*, 45 F.3d at 1445 (10th Cir.1995). However, Sentencing Guideline § 1B1.3(a)(1)(A) makes a defendant responsible for "all acts ... committed, aided, [and] abetted ... by the defendant" without regard to foreseeability. The Guideline Commentary example makes this abundantly clear:

> Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana. Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted the off-loading of the entire shipment of marihuana by directly participating in the off-loading of that shipment.... Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability.

U.S.S.G. 1B1.3 Commentary 2(a)(1) (Illustrations of Conduct for Which the Defendant is Accountable). Similarly, by directly participating in the drug recovery scheme, Mr. McCullah is responsible for the entire quantity of drugs sought to be recovered regardless of reasonable foreseeability. *Accord United States v. Pessefall*, 27 F.3d 511, 517 (11th Cir.1994), *cert. denied*, —— U.S. ——,

115 S.Ct. 1154, 130 L.Ed.2d 1112 (1995); *United States v. Corral–Ibarra,* 25 F.3d 430, 438 (7th Cir.1994).

### Sentencing Phase Challenges

### VI.   Non-statutory Aggravating Factors

The district court submitted four non-statutory aggravating factors to the jury, and the jury found all four.   The four factors were: 1) a deadly weapon was used in the killing; 2) Mr. McCullah had previously been convicted of two or more state or federal offenses punishable by imprisonment for more than one year;   3) Mr. McCullah committed the offenses as to which he was charged in the indictment;   and 4) repeated attempts to rehabilitate Mr. McCullah or deter him from future criminal behavior had been unsuccessful.

### A.

Under 21 U.S.C. § 848, the prosecutor has the discretion to urge aggravating factors not enumerated in Section 848(n) provided that proper advance notice is given. *See* 21 U.S.C. §§ 848(h)(1)(B), (j), (k), (n). Mr. McCullah contends that the prosecutor's power to promulgate non-statutory aggravating factors amounts to an unconstitutional delegation of power to the Executive Branch. Whether Congress has unconstitutionally delegated its authority is a question of law subject to *de novo* review. *See generally United States v. Allen,* 24 F.3d 1180, 1182 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 493, 130 L.Ed.2d 404 (1994).

The Supreme Court has long recognized that the federal sentencing function is "a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch." *Mistretta v. United States,* 488 U.S. 361, 390, 109 S.Ct. 647, 664, 102 L.Ed.2d 714 (1989). In *Mistretta* the Court stated:

> We ... have recognized ... that the separation-of-powers principle, and the non-delegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches.... So long as Congress "shall lay down by legis-

lative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." ... Congress simply cannot do its job absent an ability to delegate power under broad general directives.

*Mistretta,* 488 U.S. at 372, 109 S.Ct. at 654–55 (quoting *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)).   The prosecutoral discretion to promulgate non-statutory aggravating factors falls squarely within the permissible delegation of power to the Executive Branch.

At the selection stage of a capital proceeding, the focus is on "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983) (emphasis in original).   In light of this purpose, Congress, recognizing that it could not adequately account for all the possible aggravating and mitigating factors inherent in any particular homicide, allowed factors to be considered which it did not specifically enumerate in the statute. *See* 21 U.S.C. § 848(h)(1)(B), (m)(10).   To achieve the goal of individualized sentencing, Congress has properly delegated some degree of discretion to the Executive Branch, limited by the directive that the factors must be "aggravating" and further constrained by the requirement of notice. *See* 21 U.S.C. § 848(h)(1)(B). The established notion of "aggravating factors", coupled with the principle of individualized sentencing and notice, provides an "intelligible principle" to which the executive branch must conform its exercise of the delegated power. *See Mistretta,* 488 U.S. at 372, 109 S.Ct. at 654–55.   Further, the limited nature of the delegated power should also be noted; an (n)(1) statutory aggravating factor must be present for a defendant to be death-eligible, and only then do the non-statutory factors come into play. *See* 21 U.S.C. § 848(k).

The Supreme Court has dealt with the issue of non-statutory aggravating factors in state capital punishment statutes and has

held the use of non-statutory aggravating factors permissible. *Zant,* 462 U.S. at 878, 103 S.Ct. at 2743. *See Barclay v. Florida,* 463 U.S. 939, 966–67, 103 S.Ct. 3418, 3433–34, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring) (the Constitution does not require that statutory aggravating factors be "exclusive"). In *Zant* the Court stated:

> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

*Zant,* 462 U.S. at 878, 103 S.Ct. at 2743. To the extent that some delegation of discretion to the executive branch is necessary to achieve the individualized sentencing mandated by the Constitution, clearly the delegation itself cannot be unconstitutional.

### B.

Mr. McCullah challenges the constitutional validity of several of the non-statutory aggravating factors presented to the jury, as well as the sufficiency of the evidence supporting one of the factors. The constitutional validity of aggravating factors is a question of law subject to *de novo* review. *See Allen,* 24 F.3d at 1182. The sufficiency of evidence supporting an aggravating factor is reviewed under the same standard as the sufficiency of evidence supporting a conviction; we determine if the evidence, including reasonable inferences to be drawn therefrom, when taken in the light most favorable to the government, is sufficient that a reasonable jury could find the aggravating factor beyond a reasonable doubt. *See* 21 U.S.C. § 848(j); *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

### i.

Mr. McCullah argues that the "use of a deadly weapon" cannot be an aggravating factor because this factor adds nothing beyond the essential elements of the offense of murder and does not narrow the class of death-eligible defendants. Mr. McCullah claims that by definition a deadly weapon is inherent in every homicide. We disagree.

The plain, everyday meaning of the term "deadly weapon" necessarily implies an inherently dangerous instrumentality designed for use as a weapon. Such an instrumentality is not necessarily present in every homicide. For example, homicides are often accomplished by strangulation, but the reasonable juror would not presume that this was accomplished by "use of a deadly weapon." Thus, "use of a deadly weapon" may properly be used as an aggravating factor because this factor genuinely narrows the class of defendants eligible for the death penalty and aids in individualized sentencing. *See Arave v. Creech,* 507 U.S. 463, 473–75, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993); *Tuilaepa v. California,* —— U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994).

### ii.

Mr. McCullah contends that "commission of the charged offenses" cannot be used as a non-statutory aggravating factor because this factor adds nothing above and beyond the elements of the offense itself. We disagree.

In *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988), the Supreme Court held it permissible to count an element of the underlying offense as an aggravating factor where the "narrowing" function is performed at the guilt phase. *Lowenfield* involved a Louisiana capital punishment case where the statutory aggravating factor, "the offender knowingly created a risk of death or great bodily harm to more than one person," was also an element of first degree murder under the Louisiana statute. The Court in *Lowenfield* stated:

> The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggrava-

ting circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.

*Id.* at 246, 108 S.Ct. at 555. The Court found that the narrowing function was adequately performed by the statute itself, and the statutory aggravating factor merely repeated one of the narrowing conditions.

Similarly, in this case the federal statute narrows the class of death-eligible defendants by restricting the possibility of capital punishment to certain situations. 21 U.S.C. § 848(e)(1). Under *Lowenfield,* an aggravating factor that does not add anything above and beyond the offense is constitutionally permissible provided that the statute itself narrows the class of death-eligible defendants. *Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555. Thus, although the non-statutory aggravating factor, "committed the offenses charged in the indictment", may be seen as simply restating the elements of the offenses, this is not an unconstitutional aggravating factor under *Lowenfield* because the statute itself under which Mr. McCullah was indicted specifically narrows the field of death-eligible defendants. "Committed the offenses charged in the indictment" is essentially equivalent to restating the elements of each offense individually, which falls squarely within *Lowenfield.*

■ The government correctly points out that the aggravating factor "committed the offenses charged in the indictment" allowed the jury to consider the circumstances of McCullah's criminal activity. This aggravating factor allowed the jury to consider the fact that the murder was committed in furtherance of an illegal drug operation. The jury is entitled to consider the circumstances of the crime in determining whether to impose the death penalty. *Zant,* 462 U.S. at 879, 103 S.Ct. at 2743–44.

### iii.

■ Mr. McCullah claims that the evidence did not support a finding that "repeated attempts to rehabilitate the defendant . . . or deter him from future criminal behavior have been unsuccessful." We again disagree.

The record shows, and Mr. McCullah concedes, that the government presented evidence of three separate felony convictions against Defendant, all of which resulted in prison terms. The fact that Mr. McCullah continued to commit crimes after his release from prison indicates that prison failed to deter Mr. McCullah's future criminal conduct. This is sufficient to support the jury's finding that attempts to rehabilitate McCullah or to deter his future misconduct have been unsuccessful. Contrary to McCullah's contention, no evidence of more specific rehabilitative or deterrent efforts need be shown.

### VII. Statutory Aggravating Factors

The district court submitted four statutory aggravating factors to the jury, and the jury found all four. The four factors were 21 U.S.C. § 848(n)(1)(C) ("The defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim"), (n)(1)(D) ("The defendant intentionally engaged in conduct which (i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and (ii) resulted in the death of the victim"), (n)(7) ("The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value"), and (n)(8) ("The defendant committed the offense after substantial planning and premeditation"). Mr. McCullah contends that these statutory aggravating factors were erroneously submitted to the jury.

### A.

■ Mr. McCullah argues that the statutory (n)(1) factors are merely eligibility factors which Congress did not intend to be weighed against mitigating factors in the selection phase of the sentencing process. The clear language of the statute refutes this contention.

■ In interpreting a statute we look first to the plain meaning of the words of the statute, and if the words of the statute are unambiguous, our inquiry ends. *See Negonsott v. Samuels,* 507 U.S. 99, 113 S.Ct. 1119,

1122–23, 122 L.Ed.2d 457 (1993). Section 848(n)(1) is listed along with eleven other factors (§ 848(n)(2)–(12)) in a subsection entitled, "Aggravating factors for homicide." 21 U.S.C. § 848(n). The plain language of § 848(k) clearly contemplates the weighing of (n)(1) factors as aggravating factors and is unambiguous as to this point. *See* 21 U.S.C. § 848(k). Section 848(k) states, in pertinent part:

> If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

*Id.* The statutory language refers to *all* aggravating factors, which clearly includes the (n)(1) factors. In considering the references to "aggravating factors", it is dispositive that (n)(1) factors are specifically denominated as "aggravating factors" by the statute. *See* 21 U.S.C. § 848(k), (n).

The fact that Congress changed the capital sentencing scheme for other crimes six years after the adoption of § 848(e) *et seq.* does not alter the plain language interpretation of § 848(e). The Federal Death Penalty Act of 1994 created a new capital sentencing scheme for many federal offenses, but significantly did not alter § 848(e). *See* Federal Death Penalty Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (codified in scattered sections of 18 U.S.C.). Even had the 1994 Act been an amendment to § 848, it would merely indicate that Congress can, and did, alter the federal capital sentencing scheme for drug conspiracies. However, this does not in any way indicate any error in the prior scheme; there is more than one proper method of structuring a capital sentencing scheme. *See Harris v. Alabama,* —— U.S. ——, ——, ——, 115 S.Ct. 1031, 1034–35, 130 L.Ed.2d 1004 (1995). Further, there is simply no merit to Mr. McCullah's argument that the 1994 Act should be construed as "clarifying" a provision it did not even purport to amend.

### B.

■■■ Mr. McCullah argues that the § 848(n)(1) aggravating factors encompass the full universe of defendants eligible for the death penalty, making the factor constitutionally infirm because it fails to adequately narrow the class of death-eligible defendants.

■■■ While a capital sentencing scheme must adequately narrow the class of death-eligible defendants, the narrowing function may be performed by jury findings at either the sentencing phase of the trial or the guilt phase. *Lowenfield,* 484 U.S. at 244–45, 108 S.Ct. at 554–55. *See* Part VI (B)(ii), *supra.* Congress has statutorily narrowed the field of death eligible defendants by limiting the possibility of capital punishment to homicides in furtherance of continuing criminal enterprises or other specified offenses. *See* 21 U.S.C. § 848(e)(1). Thus, contrary to McCullah's assertion, only a small subset of all potentially death-eligible defendants are subject to capital punishment under the federal scheme, and thus the requisite narrowing is present. While the factors in § 848(n)(1) may mirror the intent element found at the guilt phase, this is permissible under *Lowenfield.* The narrowing function of § 848(e) makes further narrowing by § 848(n)(1) unnecessary. Furthermore, § 848 requires that the jury find at least one other aggravating factor from the list of (n)(2)–(n)(12) before the death penalty can be imposed, further reducing the field of death-eligible defendants. 21 U.S.C. § 848(k). The narrowing functions of §§ 848(e) and 848(k) clearly satisfy the constitutional requirements of *Lowenfield. Accord Chandler,* 996 F.2d at 1093.

Mr. McCullah suggests that *Lowenfield* is distinguishable because the aggravating factor was not as broadly inclusive as the factor here. However, the difference is merely illusory; indeed the federal capital sentencing scheme is more lenient than the one upheld in *Lowenfield.* The Louisiana capital punishment statute made "first degree murder" a capital offense and defined "first degree mur-

der" to include "when the offender has a specific intent to kill ... more than one person." *Lowenfield,* 484 U.S. at 242, 108 S.Ct. at 553. The statute made "knowingly created the risk of death ... to more than one person" a statutory aggravating factor. *Id.* at 243, 108 S.Ct. at 553–54. Therein, the defendant was convicted of first degree murder on the basis of his intent to kill more than one person and sentenced to death on the basis of that sole statutory aggravating factor as well. Thus no narrowing function was served by the aggravating factor, but rather the narrowing occurred in the statutory definition of first degree murder.

Similarly, in the federal scheme the (n)(1) factor does not narrow the field of death-eligible defendants, rather the narrowing is accomplished by statutory definition in § 848(e). Mr. McCullah suggests that the federal scheme is different from the Louisiana statute in *Lowenfield* because the (n)(1) factor does not exactly duplicate the § 848(e) narrowing factors, but is broader than § 848(e). This difference is immaterial because the practical effect is the same regardless of whether the aggravating factor exactly mirrors the statutory elements or extends slightly beyond.

■■■ Mr. McCullah argues that the Supreme Court's decision in *Arave v. Creech* requires that aggravating factors must play a narrowing role. *See Arave,* 507 U.S. at 473–75, 113 S.Ct. at 1542. However, this is incorrect. *Arave* is distinguishable because the capital punishment statute in that case was "defined broadly to include all first-degree murderers ... [a]nd the category of first-degree murderers is also broad." *Id.* at 475, 113 S.Ct. at 1542–43. Thus, a broad capital punishment statute necessitates that the narrowing function be performed by the aggravating factors, whereas here the narrowing function was performed by the statute itself. *See Lowenfield,* 484 U.S. at 244–46, 108 S.Ct. at 554–55.

### C.

The jury found as a statutory aggravating factor that Mr. McCullah "committed the offense after substantial planning and premeditation." *See* 21 U.S.C. § 848(n)(8). Mr.

McCullah contends that this factor was submitted in error because the statutory language is unconstitutionally vague and that the evidence fails to support the jury's finding.

### i.

■■■ The Supreme Court has announced that a vagueness review should be "quite deferential" because "mathematical precision" is not possible in the definition of aggravating factors. *Tuilaepa,* —— U.S. at ——, 114 S.Ct. at 2635. The "basic principle" is that "a factor is not unconstitutional if it has some 'commonsense core of meaning ... that criminal juries should be capable of understanding.'" *Id.* at —— –——, 114 S.Ct. at 2635–36 (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959–60, 49 L.Ed.2d 929 (1976) (White, J., concurring)). Nevertheless, an aggravating factor may be unconstitutionally vague if it "leave[s] the sentencer without sufficient guidance for determining the presence or absence of the factor." *Espinosa v. Florida,* 505 U.S. 1079, 1081, 120 L.Ed.2d 854, 112 S.Ct. 2926, 2928 (1992).

Mr. McCullah argues that the word "substantial" is inherently ambiguous and vague. We disagree. In the context in which it appears, the term clearly has a commonsense meaning of "considerable in quantity: significantly large," which criminal juries are capable of understanding. *See* Webster's Ninth New Collegiate Dictionary 1176 (1991). In the context in which it appeared, it could not be reasonably confused with the alternative definition denoting mere existence, as in the sense of having substance.

■■■ Mr. McCullah requested that the district court instruct the jury that: "'Substantial' planning means considerably more planning than is typical for the commission of the crime at issue, in this case, murder." The district court instead instructed the jury that: "'Substantial' planning means planning which is considerable or ample for the commission of the crime at issue." We find no error in the district court's definition. "Substantial" planning does not require "considerably more planning than is typical" but rath-

er it means "considerable" or "ample for commission of the crime."

### ii.

■ Mr. McCullah argues that there was insufficient evidence to support a finding of substantial planning because the murder victim was not the intended victim. We disagree. Section 848(n)(8) is not drafted in a victim-specific fashion, nor should it be construed that way. The plain language of the statutory factor states: "The defendant committed the offense after substantial planning and premeditation." 21 U.S.C. § 848(n)(8). The "offense" refers to Section 848(e), which is also not drafted in a victim-specific fashion, referring only to the "intentional killing of an individual." *See* 21 U.S.C. § 848(e)(1)(A). In this case, substantial planning and premeditation resulted in the construction of a deadly encounter, and the fact that the eventual victim was not the intended victim does not alter the fact that the killing of an individual was accomplished by the premeditated plan.

### D.

■ The jury found as a statutory aggravating factor that Mr. McCullah "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." *See* 21 U.S.C. § 848(n)(7). Mr. McCullah contends that the evidence was insufficient to support this finding because any compensation received was for the killing of Rogers, not Collins, the eventual victim. This argument is disingenuous.

Like section 848(e), section 848(n)(7) is not framed in victim-specific terms. Mr. McCullah committed the offense for pecuniary gain, even if he did not kill the right person. Mr. McCullah does not, and indeed could not, dispute the fact that he participated in the murder for pecuniary reward, and that more than satisfies the statutory factor.

### VIII. Duplicative Aggravating Factors

Mr. McCullah contends that the district court erred in submitting duplicative and cumulative aggravating factors to the jury. We agree.

■ The district court submitted to the jury both the § 848(n)(1)(C) statutory aggravating factor, "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in death of the victim," and the non-statutory aggravating factor, "committed the offenses as to which he is charged in the indictment." These two factors substantially overlap with one another. In order for the jury to find that Mr. McCullah committed the offenses with which he was charged, the jury necessarily had to conclude that Mr. McCullah did intentionally kill an individual, or did intentionally counsel, command, induce, procure, or cause the killing of an individual, and such killing did result or happen. *See* 21 U.S.C. § 848(e).

■ The district court also submitted to the jury both the Section 848(n)(1)(C) and (n)(1)(D) statutory aggravating factors. The (n)(1)(D) factor requires that the defendant intentionally engages in conduct which he knows creates a grave risk of death and that such death results. 21 U.S.C. § 848(n)(1)(D). This substantially overlaps with the (n)(1)(C) factor which refers to intentional conduct intending that the victim be killed. *See* 21 U.S.C. § 848(n)(1)(C). Any intentional conduct aimed at producing death is by definition conduct done with knowledge of grave risk of death. While the factors are not identical per se, the (n)(1)(C) factor necessarily subsumes the (n)(1)(D) factor.

■ Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. *Cf. Stringer v. Black*, 503 U.S. 222, 230–32, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992). As the Supreme Court of Utah pointed out, when the same aggravating factor is counted twice, the "defendant is essentially condemned 'twice for the same culpable act,'" which is inherently unfair. *Parsons v. Barnes*, 871 P.2d 516, 529 (Utah) (quoting *Cook v. State*, 369 So.2d 1251, 1256 (Ala.1979)), *cert. denied*, ——

U.S. ——, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994). While the federal statute at issue is a weighing statute which allows the jury to accord as much or as little weight to any particular aggravating factor, the mere finding of an aggravating factor cannot but imply a qualitative value to that factor. *Cf. Engberg v. Meyer*, 820 P.2d 70, 89 (Wyo.1991). When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot "assume it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer*, 503 U.S. at 232, 112 S.Ct. at 1137. In *Stringer* the Supreme Court made it clear that:

> When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.

*Id.* We hold that the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors.

To the extent that Congress wants a particular aggravating factor to receive enhanced weight in the sentencing process, it can provide for such enhancement in the statute itself. However, Congress elected not to do so, and the prosecutor cannot attempt to circumvent Congress's inaction by introducing the same factor in a different guise a second time.

### IX. Mitigating Factors

The district court submitted sixteen mitigating factors to the jury. While at least one juror found the existence of every factor, only three factors were found by a consensus. Mr. McCullah claims that the jurors erred in failing to find three mitigating factors established by uncontradicted evidence. We disagree.

Under Section 848(k), mitigating factors are weighed by each juror individually. 21 U.S.C. § 848(k). However, if the evidence does not support a juror's failure to find a mitigating factor, the resulting death sentence is unsound. 21 U.S.C. § 848(q)(3). The defense has the burden of proving mitigating factors by a preponderance of the evidence. 21 U.S.C. § 848(j).

▮ The government questions whether Mr. McCullah may seek review of the jury findings because at least one juror found each mitigating factor. The statute refers to the "failure to find ... any mitigating factors," but does not specify whether a finding by a single juror suffices to preclude judicial review. *See* 21 U.S.C. § 848(q)(3)(B). We believe that a non-unanimous finding is subject to appellate review. Any other result would be contrary to the intent of the statute and would preclude appellate review where an incontrovertible fact is denied by all but one juror. Indeed, it seems clearly contrary to the spirit and intent of the statute to provide for appellate review where no juror finds a mitigating factor, but to deny such review where but a single juror finds such a factor.

▮ We review a juror's finding concerning the absence of mitigating factors in the light most favorable to the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Jurors are not required to believe the testimony of witnesses simply because the testimony is not directly contradicted. *See Maggio v. Fulford*, 462 U.S. 111, 117–118, 103 S.Ct. 2261, 2264–65, 76 L.Ed.2d 794 (1983). The credibility of witnesses is an issue that is the proper province of the trier of fact, and thus as an appellate court we must be cautious and deferential in our review of factual findings of jurors.

▮ Mr. McCullah argues that he presented uncontradicted testimony from Dr. Randall Price that his I.Q. is currently 80, and yet one juror refused to so find. A review of the record reveals several facts which may have lead a reasonable juror to conclude that Mr. McCullah failed to prove his I.Q. to be 80. In his testimony, Dr. Price announced his finding that McCullah's full scale I.Q. was 80, but noted an unusually large discrepancy between Mr. McCullah's verbal I.Q., 77, and his performance I.Q., 91. 38 R. 179–80. Further, an earlier I.Q. test placed Defendant's I.Q. at 96. 38 R. 184. On cross-examination Dr. Price indicated

that motivation was a factor in the score, and an unmotivated individual might score lower than his actual abilities. 38 R. 196–97. Dr. Price also conceded that Mr. McCullah might have incentive to distort his abilities considering the context of the criminal proceeding. 38 R. 201–02. Under these circumstances, a reasonable juror might well have concluded that Dr. Price's opinion as to Mr. McCullah's I.Q. was suspect and not credible considering McCullah's incentive to distort his abilities and in light of the anomalous test results.

Mr. McCullah challenges the finding by four jurors that he did not suffer from brain dysfunction. Mr. McCullah again relies on the testimony of Dr. Price who stated that Mr. McCullah's learning problems were "probably due to organic brain dysfunction." 38 R. 181. However, Dr. Price admitted on cross-examination that he lacked "hard medical evidence" to support this proposition but rather was relying on neuropsychological evidence. 38 R. 201. Considering Mr. McCullah's incentive to distort his condition in his interview with Dr. Price as discussed above, and in light of the shakiness of Dr. Price's "conclusion", a reasonable juror could certainly have concluded that Mr. McCullah failed to prove that he suffered from brain dysfunction.

Mr. McCullah also challenges the finding of ten jurors who determined that he failed to prove that he suffered from attention-deficit disorder. Again, Mr. McCullah primarily relies upon Dr. Price's testimony, which as we stated above, a reasonable juror could certainly have questioned. Mr. McCullah also relies upon the equivocal testimony of Jean Williamson, a school psychologist who worked with him over twenty years ago, who stated that he "demonstrated symptoms" of attention-deficit disorder. 38 R. 73. This testimony and that of Dr. Price simply do not compel the conclusion that Mr. McCullah suffered from attention-deficit disorder, and as an appellate court we will not question jurors' findings supported by the record.

X.  Amendment of the Aggravating Factors

Mr. McCullah contends that the district court erred by submitting a new ag-gravating factor to replace an erroneous one after closing arguments in the penalty phase. We do not need to reach this issue because we remand the sentencing phase proceedings. However, we note that the trial court's failure to comply with Rule 30 constitutes reversible error only if the party was "unfairly prevented from arguing his defense to the jury or was substantially misled in formulating his arguments." *United States v. Smith,* 629 F.2d 650, 653 (10th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980). The record in this case does not indicate that Mr. McCullah was unfairly prejudiced in his arguments, especially since Mr. McCullah's counsel recognized that the new factor properly stated the law. Importantly, although Mr. McCullah argues that he would have modified his summation had he known about the amended instruction, Mr. McCullah's counsel did not object on that basis, nor did he seek leave to present additional argument in light of the amended instruction. Further, Mr. McCullah has failed to demonstrate how he was substantively prejudiced—how the argument and result would have been any different.

XI.  Voir Dire on Mitigating Factors

Mr. McCullah contends that the district court erred by restricting the voir dire regarding the jurors' ability to consider mitigating factors. We have reviewed the record and disagree.

The trial court retains great latitude in its oversight of voir dire. *Mu'Min v. Virginia,* 500 U.S. 415, 424, 427, 111 S.Ct. 1899, 1904–05, 1906, 114 L.Ed.2d 493 (1991). In *Morgan v. Illinois,* 504 U.S. 719, 727–31, 119 L.Ed.2d 492, 112 S.Ct. 2222, 2229–30 (1992), the Supreme Court held that a juror who would automatically vote for the death penalty in every case was not impartial because the presence of aggravating or mitigating factors was irrelevant to such a juror. Voir dire must adequately identify such unqualified jurors, and to this end, certain inquiries must be made in capital cases. *Morgan,* 504 U.S. at 729–31, 112 S.Ct. at 2230.

Under *Morgan,* general fairness and "follow the law" questions alone are insufficient

to insure against a death-biased jury. *Id.* at 732–36, 112 S.Ct. at 2232–2233. However, despite Mr. McCullah's assertions to the contrary, the voir dire in this case extended beyond mere general impartiality and "follow the law" questions and adequately explored jurors' views on mitigation. The district court was not required, as Mr. McCullah suggests, to allow inquiry into each juror's views as to specific mitigating factors as long as the voir dire was adequate to detect those in the venire who would *automatically* vote for the death penalty. *See id.* at 732–34, 112 S.Ct. at 2232. The record reveals that the district court specifically asked each juror whether he would recommend against the death penalty if the law and the evidence justified it and allowed counsel to elicit information on jurors' views toward mitigating circumstances and toward automatic imposition of the death penalty. *Morgan* requires no more.

XII. Prosecution's Penalty Phase Statements, Penalty Stage Trial Format, Proportionality of the Death Sentence and Method of Execution

Because we remand the case for resentencing, we need not reach these issues.

*Issues Raised by Codefendants*

Mr. McCullah adopts the arguments made by his codefendants in their appeals. We have carefully considered all of these arguments and find them without merit.

We AFFIRM all of Mr. McCullah's convictions, but we REMAND the case for a new penalty phase proceeding consistent with this opinion.