**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 23, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOHN JAVILO McCULLAH,

    Defendant - Appellant.

No. 03-7134 & 04-7021
(E.D. Oklahoma)
(D.Ct. No. 92-CR-32-S)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **O'BRIEN**, Circuit Judges, and **STEWART**, District Judge.[**]

---

This is a consolidated appeal. In Case No. 03-7134, John J. McCullah appeals the district court's denial of his motion for new trial under FED. R. CRIM. P. 33. In Case No. 04-7021, McCullah appeals the court's denial of his motion for sentencing relief under 28 U.S.C. § 2255, in which he raised claims based on *Brady v. Maryland,* 373 U.S. 83 (1963) (failure to disclose exculpatory evidence),

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Ted Stewart, United States District Judge for the District of Utah, sitting by designation.

*Napue v. Illinois,* 360 U.S. 264 (1959) (allowing perjured testimony to stand) and

*Apprendi v. New Jersey,* 530 U.S. 466 (2000) (sentenced on facts not found by

jury beyond a reasonable doubt).[1] The district court granted a certificate of

appealability (COA) on the *Brady* and *Napue* claims but denied one on the

*Apprendi* claim. On appeal, McCullah renews his request for a COA on the

*Apprendi* claim.[2] Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and

2253(a) and (c)(1), we vacate the order denying the motion for new trial because

the district court lacked jurisdiction to decide it, affirm the court's order denying

§ 2255 relief and deny a COA.

## I. Procedural History

On March 11, 1993, a jury convicted McCullah of the following: drug

---

[1]We earlier ordered McCullah to show cause why it was appropriate to allow the § 2255 appeal to proceed while his direct appeal was pending. While there is no jurisdictional bar to the district court deciding a § 2255 motion during the pendency of a direct appeal, *see* Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Proceedings for the United States District Courts (2004) (citing *Womack v. United States*, 395 F.2d 630, 631 (D.C. Cir. 1968)), "[a]bsent extraordinary circumstances, the orderly administration of criminal justice precludes a district court from considering a § 2255 motion while review of the direct appeal is still pending." *United States v. Cook*, 997 F.2d 1312, 1319 (10th Cir. 1993). We believe these principles are no less applicable to the question of consolidated appellate review of decisions denying § 2255 relief and a motion for new trial. Nevertheless, we conclude, and the parties agree, that it is both appropriate and in the interests of judicial economy for us to consider the consolidated appeals in light of the similarity of the issues presented therein.

[2]We treat McCullah's notice of appeal of the order denying § 2255 relief as a request for a COA on the *Apprendi* claim since he made no specific request for one in this court. *See* FED. R. APP. P. 22(b)(2).

conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); conspiracy to violate 18 U.S.C. § 1958(a) in violation of 18 U.S.C. § 371 (Count 13); interstate travel with intent to commit murder for hire in violation of 18 U.S.C. § 1958(a) (Count 14); and murder in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Count 16). As to Count 1, the jury did not specifically find a type or amount of drug involved in the conspiracy. The jury recommended a sentence of death on Count 16. The trial court imposed the sentence of death on Count 16, concurrent life terms on Counts 1 and 14 and a concurrent term of five years on Count 13.

On direct appeal, we upheld all the convictions but vacated the death sentence and remanded for resentencing on Count 16. *See United States v. McCullah,* 76 F.3d 1087 (10th Cir. 1996), *cert. denied,* 520 U.S. 1213 (1997). The mandate of affirmance of McCullah's convictions issued July 5, 1996. *See* General Docket, U.S. Court of Appeals for the Tenth Circuit, *United States v. McCullah* (Case No. 93-7118). On remand, the Government withdrew its request for the death sentence. On February 18, 2000, McCullah was resentenced on Count 16 to life imprisonment without parole; he did not appeal. Sentences on the other counts remained unchanged.

On February 16, 2001, McCullah filed a § 2255 motion, later amended, in which he asserted *Brady, Napue* and *Apprendi* claims. As a prophylactic measure,

in response to the Government's contention his § 2255 claims were unexhausted and thus procedurally barred, McCullah filed a motion for new trial under FED. R. CRIM. P. 33 on the grounds of newly discovered evidence. He filed his motion on February 14, 2002, and raised the same *Brady* and *Napue* claims already presented in his § 2255 motion. The Government objected to the timeliness of the motion for new trial. The district court avoided the timeliness issue, addressed the merits of both the § 2255 claim[3] and the motion for new trial and denied both.

## II. Threshold Issues

### A. Case No. 03-7134 - No Jurisdiction

At the outset, we examine whether the district court had jurisdiction to rule on the merits of McCullah's motion for new trial. We conclude it did not. Federal courts are powerless to entertain the merits of a claim over which they have no jurisdiction even if the parties fail to raise the issue. *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986). In particular, federal courts may not assume jurisdiction in order to reach a question on the merits simply because it is more easily resolved than the jurisdictional one. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93-94 (1998). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the

---

[3]The court did not hold an evidentiary hearing. Instead, it relied on McCullah's submissions which included exhibits and deposition testimony.

-4-

United States and is inflexible and without exception." *Id.* at 94 (quotation marks omitted). Rule 33 time limits are jurisdictional. *United States v. Quintanilla,* 193 F.3d 1139, 1148 (10th Cir. 1999).

The timeliness of McCullah's Rule 33 motion turns on which version of the rule applied to his filing. Rule 33 was amended in 1998. Pre-amendment, the rule provided: "A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment . . . ." FED. R. CRIM. P. 33 (1998). When McCullah filed his motion, the amended rule provided: "A motion for new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty." FED. R. CRIM. P. 33 (2002). In the district court, the parties disputed which version applied.[4] We need not decide the question because McCullah's motion was untimely under either one.

The jury returned its verdicts on March 11, 1993. Under the amended rule, McCullah had three years, until March 12, 1996, to file his motion. Therefore, his motion for new trial under the amended rule, filed February 14, 2002, was untimely. Whether McCullah's motion would have been timely under the pre-amendment rule turns on the meaning of "final judgment." "All the courts which have considered

---

[4]In its order adopting the amendment, the Supreme Court stated it should "govern all proceedings in criminal cases thereafter commenced and, *insofar as just and practicable*, all proceedings in criminal cases then pending." FED. R. CRIM. P. Orders of the Supreme Court of the United States Adopting and Amending Rules, Order of April 24, 1998 (emphasis added).

the meaning of 'final judgment' . . . have concluded that 'final judgment' includes the mandate of affirmance from the appellate court." *Casias v. United States,* 337 F.2d 354, 356 (10th Cir. 1964). In considering the meaning of "final judgment" we bear in mind the purpose of a Rule 33 motion. It is to obtain a new trial, not a new sentencing. Therefore, we conclude "final judgment" in the context of Rule 33 means issuance of the mandate of affirmance of conviction from the appellate court, even if, as here, sentencing issues remain. In arriving at this conclusion, we adopt the reasoning of the Second Circuit in deciding the same issue. *See United States v. Camacho,* 370 F.3d 303, 307 (2nd Cir. 2004), *cert. denied,* 125 S.Ct. 1619 (2005) ("A defendant's ability to bring newly discovered evidence to light in a new trial in no way hinges on the fate of the sentence imposed on his or her original conviction."). Under the pre-amendment rule, McCullah's motion was untimely because he filed it February 14, 2002, more than two years after the date of issuance of the mandate of affirmance of conviction on July 5, 1996. Therefore, whether considered under amended Rule 33 or the pre-amendment rule, the district court erred in assuming jurisdiction to consider the merits of McCullah's motion for new trial.

**B.    *Case No. 04-7021 - No Procedural Bar***

As noted, McCullah's motion for new trial was prompted by the Government's argument his § 2255 motion was procedurally barred for failure to

raise the *Brady* and *Napue* claims on direct appeal. Although the Government fails to press the issue with any vigor on appeal, we nonetheless dispose of it. "A defendant is procedurally barred from presenting any claim in a section 2255 petition that he failed to raise on direct appeal unless he can demonstrate cause for his procedural default and prejudice suffered thereby, or that the failure to hear his claim would result in a fundamental miscarriage of justice." *United States v. Wright,* 43 F.3d 491, 496 (10th Cir. 1994). In order to enforce the bar, we must conclude McCullah could have but failed to present his newly discovered evidence in the time allowed by Rule 33. He has stated "[d]efense counsel only began to learn of the withheld evidence in late December of 1997, in response to a subpoena issued to the United States Parole Commission." (Tr. R. Vol. 1, Docket Entry 835 at 14). While this date, if uncontradicted, is outside the deadline set by amended Rule 33 (March 12, 1996) and thus would not result in procedural bar, it is within the deadline allowed by pre-amendment Rule 33 (July 5, 1998) and thus implicates the bar. In the interests of judicial economy, however, we choose to avoid deciding the procedural bar issue and instead resolve the case on the merits. *See Wright,* 43 F.3d at 496 (deciding § 2255 claim on the merits instead of resolving procedural bar).

### III. Standard of Review

In a § 2255 appeal, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Kennedy,* 225 F.3d 1187,

1193 (10th Cir. 2000). As to a request for COA, we lack jurisdiction to review the merits of a claim until a COA is issued. 28 U.S.C. § 2253(c)(1)(B); *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). A COA can issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 327 (citing *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)).

## IV. *Factual Background*

### A. *Trial Record*

On direct appeal, we recited material facts established by the evidence at trial. Identifying no advantage in replowing furrowed ground, we repeat them here:

> This case arises from the activities of a large California-based drug organization managed by Joseph "Eddie" Arvizu. The Arvizu organization distributed cocaine and marijuana across the country in trucks. Members of the organization included: Ray Molina, Mr. Arvizu's cousin and confidante; Norwood Hutching, an Oklahoma rancher and businessman who oversaw the cross-country transportation; Tony Wiscowiche, a close confidante of Mr. Arvizu; Thomas "Stimey" Sanchez, a guard and occasional drug courier; and Gabriel Lozano, another guard and courier.
>
> In April 1991, a pickup truck containing nearly 100 kilograms of cocaine was stolen from the Arvizu organization by James Shiew, one of the organization's cross-country drivers. The truck was parked at the Hulbert, Oklahoma, residence of Ruth Ford at the time of the theft.

Upon learning of the truck's disappearance, Mr. Hutching launched a search, offering a reward for the truck's recovery. Both Mr. Hutching and Mr. Arvizu questioned Mr. Shiew about the theft, but he skillfully diverted suspicion from himself and instead implicated a man named Avery Rogers. Mr. Rogers, who operated a combination used car lot and pig farm, was a friend of Ruth Ford, from whose residence the truck had been stolen. Mr. Hutching and Mr. Arvizu soon began to suspect that Mr. Rogers and Ms. Ford were behind the theft.

The Arvizu organization, led by Mr. Arvizu himself, set up headquarters in Tulsa, Oklahoma, to oversee the recovery of the stolen drugs. The organization attempted to kidnap Ms. Ford and make her reveal the whereabouts of the drugs, but this plan was thwarted when Ms. Ford refused to open her door.

Mr. Arvizu's next plan involved an attempted kidnapping and torture of Mr. Rogers. This plan was abandoned when one of Mr. Rogers' farm animals began making noise, betraying the kidnappers' presence.

Mr. Arvizu then decided to attempt a roadside ambush of Mr. Rogers. As Mr. Rogers drove home along a wooded road in his truck, a car blocked the road ahead of him while a van blocked the rear. Mr. Molina and Mr. Sanchez emerged from the car and began firing at Mr. Rogers. Mr. Rogers backed his truck off the road out of the ambush and eventually smashed his truck into a tree in the woods. Under cover of the woods, Mr. Rogers returned to his home on foot and notified the police. After the failure of this ambush, Mr. Arvizu and his party returned to California.

Mr. Arvizu continued to plot against Mr. Rogers after his return to California. In May 1991, Mr. Arvizu hired three non-English-speaking Mexican gunmen--"pistoleros"--and had Mr. Wiscowiche drive them to Oklahoma. Meanwhile, Mr. Molina recruited Joe Mendoza and Mr. McCullah in California to assist in the recovery of the stolen drugs. Mr. McCullah, Mr. Molina, Mr. Mendoza, and Mr. Sanchez all drove from California to Oklahoma together in late May.

Mr. Molina's group rendezvoused with the pistoleros at a lake house in Wagoner, Oklahoma. They were joined there by two other Mexican nationals, bringing the total to five: Poncho, Carlos, Juan, Mikey, and

-9-

Roberto. Mr. Arvizu and Mr. Hutching arrived at the lake house shortly thereafter, the latter bringing a large cache of firearms. Mr. Arvizu and Mr. Hutching then departed the lake house, never to return.

The group remained at the lake house for about two weeks under the supervision of Mr. Molina. During that time, several plans were devised to kill Mr. Rogers. The initial plan, formulated by Mr. Arvizu and Mr. Molina, was to kidnap and torture Mr. Rogers until he revealed the whereabouts of the drugs, then kill him. A second plan, suggested by Mr. Molina, was to go to Mr. Rogers' used car lot and kill everyone there and then to go after Ms. Ford. The plan finally adopted, designed by either Mr. Wiscowiche and Mr. McCullah, or by Mr. Sanchez, Mr. McCullah and Poncho, was to lure Mr. Rogers away from the used car lot and kill him. Mr. McCullah, being the lone non-Hispanic, volunteered to act as the lure, reasoning that he would arouse less suspicion than the others.

The group then undertook the necessary preparatory steps. Mr. Wiscowiche and Mr. McCullah, acting on Mr. Arvizu's instructions, purchased a total of four used vehicles for the operation. At Mr. Molina's direction, Mr. McCullah and Mr. Wiscowiche also purchased ammunition for the various weapons, and Mr. Wiscowiche cleaned the weapons. Mr. Wiscowiche, Mr. McCullah, and Poncho drove around the region and selected an appropriate ambush site. Mr. McCullah, accompanied by Mr. Wiscowiche, reconnoitered the area around the used car lot. Finally, Mr. Wiscowiche attempted to cut the telephone line leading to Mr. Rogers' car lot, but inadvertently only cut the ground wire.

On June 3, 1991, Mr. McCullah, posing as a prospective customer, met Mr. Rogers at his used car lot. Mr. Rogers took Mr. McCullah for a test drive in a Pontiac Fiero, driving out to the ambush site. At the conclusion of the test drive, Mr. McCullah stated that he would return later that day, but he failed to do so. Mr. McCullah reported back to the lake house that Mr. Rogers was "going for the bait."

The next morning, Mr. Molina departed for Los Angeles. He gave Mr. Wiscowiche $5,000 to distribute among the people remaining at the lake house, with $2,000 to go to Mr. McCullah. Mr. Wiscowiche distributed the money as directed.

Pursuant to the ambush plan explained by Mr. McCullah and Poncho, the other participants drove to their assigned places. Mr. McCullah returned to Mr. Rogers' used car lot, chose another car and asked to test drive it. Unable to accompany him, Mr. Rogers asked one of his employees, Jewell Leon Collins, primarily a detail man, to accompany Mr. McCullah on the test drive. Mr. Collins bore no resemblance to Mr. Rogers. Regardless, Mr. McCullah departed the lot with Mr. Collins in a 1975 Chevrolet.

Mr. McCullah drove the Chevrolet to the prearranged ambush site with Poncho and Carlos following them in another car. Mr. Mendoza and Juan were already on-site in another car to pick up the gunmen. Upon arrival at the ambush site, Mr. McCullah stopped the car and quickly exited the vehicle, leaving Mr. Collins in the vehicle. At the same time Poncho emerged from the trailing car, ran to the Chevrolet, and fired a single shot at point-blank range into Mr. Collins' head, killing him instantly. Mr. McCullah drove away in Poncho and Carlos's car, while Poncho and Carlos joined Mr. Mendoza and Juan in the waiting vehicle. The four drove onto a nearby dirt road and discarded their firearms in the undergrowth.

The entire group except for Mr. McCullah, who apparently returned to California by himself, rendezvoused at a restaurant in Wagoner, Oklahoma, and then proceeded to the Tulsa airport. Mr. Wiscowiche, Carlos and Poncho flew back to Los Angeles, and the others returned by car or bus.

Soon after the murder, the Arvizu organization's drug trafficking operation came under the scrutiny of California law enforcement officials. As the investigation progressed, some members of the organization, including Mr. Lozano, Mr. Wiscowiche and Mr. Shiew, were persuaded to come forward and cooperate with the investigation. This allowed the FBI to piece together what happened in Oklahoma and led to the eventual arrest and 29-count superseding indictment of Mr. McCullah, Mr. Molina, Mr. Mendoza, Mr. Sanchez, and Mr. Hutching. Mr. Arvizu fled to Mexico in January 1992 and has not been seen since. Before the trial began, Mr. Mendoza negotiated a plea bargain in return for his cooperation and trial testimony.

*McCullah*, 76 F.3d at 1095-97. Wiscowiche testified McCullah told him he could

have killed Rogers during the first test-drive if only he had been provided a firearm.

Apart from forensic evidence placing him at the lake house,[5] McCullah was convicted of participation in the drug conspiracy and in the planning and execution of the murder largely on the testimony of confederates Wiscowiche and Mendoza.[6] Each had a multiple felony history. Wiscowiche was not charged, although, at the time he testified, the Government had made no promises to him that he could avoid charges by testifying. Mendoza, as indicated, plea-bargained in exchange for his

_____

[5]An FBI fingerprint specialist identified the prints on a plastic container found at the lake house to be those of McCullah.

[6]Gabriel Lozano, an Arvizu lieutenant, testified that at the behest of law enforcement, in a monitored conversation, he elicited from McCullah details of the slaying. These details matched the accounts of Wiscowiche and Mendoza. In this conversation, McCullah stated he was willing to return to Oklahoma and kill Rogers. We decided on direct appeal that the statement was coerced and its admission was error. However, at least in the guilt phase, we concluded the error was harmless. *United States v. McCullah,* 76 F.3d 1087, 1100-02 (10th Cir. 1996). We added:

> Reviewing the evidence against Mr. McCullah, we find that there was overwhelming evidence to convict Mr. McCullah of the crimes charged even in the absence of his coerced statements. The coerced statements mainly pertained to Mr. McCullah's actions in Oklahoma, and the record is replete with a tremendous amount of other evidence as to Mr. McCullah's actions in Oklahoma. Evidence of fingerprints together with the testimony of several witnesses placed Mr. McCullah in Oklahoma at the lake house and at the homicide scene. Several witnesses testified to Mr. McCullah's pivotal role in both the planning and execution of the murder, as well as to the payment he received. We find that with regard to Mr. McCullah's convictions, the admission of Mr. McCullah's statements to Mr. Lozano was harmless beyond a reasonable doubt.

*Id.* at 1101-02.

-12-

testimony.[7]  With these arrangements in mind, the trial court gave the jury curative instructions urging caution and scrutiny in evaluating the testimony of these witnesses.[8]

A third witness whose testimony tended to implicate McCullah was Avery Rogers, a man of central interest to this appeal.  He was asked whether he could

---

[7]Mendoza agreed to plead guilty to conspiracy to travel in interstate commerce with the intent to commit murder for hire in violation of 18 U.S.C. §§ 1958(a) and 371. He was eventually sentenced to sixty months imprisonment.

[8]The court instructed as follows:

Testimony of Informant

The testimony of an informant or any witness whose self-interest is shown to be such as might tend to promote or encourage testimony unfavorable to a defendant should always be considered with caution and weighed with great care and scrutiny in light of all of the evidence in determining its credibility.

Witness - Personal Advantage

The testimony of a witness who provides evidence against a defendant or defendants for his own advantage that it will give to him or in contemplation of immunity or reduction from punishment must be examined and weighed with greater care or greater scrutiny than the testimony of an ordinary witness.  You must determine whether the witness's testimony has been affected as to its credibility by any interest he has in any special treatment he receives or any interest he has in the outcome of the trial or any prejudice he has against that defendant or those defendants.

(Tr. R. Vol. 1 at 496.)

identify the man who test-drove the Pontiac Fiero on June 3 and who returned the next day to test-drive the Chevrolet with Jewell Collins. This colloquy ensued:

Q. Do you see that man here in the courtroom?

A. I can't make a positive.

Q. Do you see anyone who looks like that man?

A. Sure do.

(Tr. R. Vol. 5 at 45). With the stated caveat, he identified McCullah.

On direct examination by the Government, Rogers admitted to having a federal conviction in 1983 for conspiracy to possess a controlled substance with intent to distribute.[9] For this offense, he received a ten-year sentence. He was paroled after thirty months. He attributed his early parole to his laudable performance as captain of the prison fire department in putting out a fire in a nearby town. He denied being an FBI informant, paid or unpaid.

Rogers testified he helped look for the stolen pickup truck at Hutching's request, pretending to the jury he had no knowledge of its hidden cargo. After first suggesting he helped look for the truck free of charge, he grudgingly admitted to an understanding that Hutching held out a reward for its location. He added the truck itself was worth between $4,000 and $5,000. He minimized the number of times he had contact with Hutching during the period when he was looking for the truck,

---

[9]He also admitted to having an Oklahoma conviction for burglary in 1961.

claiming it was only two to four times. In fact, FBI records indicated that between April 15 and June 5, 1991, the two conversed by phone (or attempted to) forty-six times. At one point, the Government impeached Rogers with his grand jury testimony on the question whether he was familiar with Hutching's finances.

In cross-examination, McCullah's counsel attacked Rogers' tentative identification of McCullah. Defense counsel representing another defendant attacked Rogers' credibility by alluding to the fact Rogers had failed a polygraph test and by raising the issue of Rogers' prior acquaintance with the lead FBI investigator in the case, Agent Ray Collins (no relation to the murder victim). Rogers stated he reached out to Agent Collins during the investigation of the Jewell Collins killing because he did not trust the local authorities. Rogers admitted Agent Collins had been the arresting officer in the offense leading to his 1983 federal conviction.

This cross-examination ensued:

Q. And after that time [the arrest], have you had conversations with him from the time you were arrested and put in a federal penitentiary until you came to him this time?

A. Maybe occasionally, at a racetrack or something I might speak to him or something like that.

Q. Other than at a racetrack, have you talked to him at his office on any official business?

A. I don't recall any.

(*Id.* at 82.)

And then this colloquy:

Q.  During the time you were in the federal penitentiary did you have any conversation with Special Agent Rayburn Collins?

A.  I might have had on one occasion.

Q.  Can you tell us, sir, if you are not an FBI informant?

A.  I'm sure not.

Q.  Well, why in the world would Mr. Collins want to talk to you in the federal penitentiary when you're locked up?

A.  Why does a lot of people come to the federal prisons, I don't know.

Q.  It wasn't to get information?

A.  No.

Q.  He was just there to visit with you?

A.  Well, I don't work for the Government and I'm not no federal employee.

Q.  I'm not claiming they are paying you for it, I'm just asking if he did come to the penitentiary to talk to you, and you say it wasn't to get information?

A.  Yes, not from me.

Q.  Huh?

A.  He didn't get any information from me.

Q.  He just went there to visit?

A.    I guess.

(*Id.* at 91-92.)  When Agent Collins later testified, McCullah's counsel declined to cross-examine him with respect to the meeting he had with Rogers while Rogers was confined in the federal penitentiary.

Rogers also testified a test-drive normally did not exceed thirty minutes. Nonetheless, he waited anywhere from two to four hours to report Jewell Collins' absence to local authorities.  In cross-examination, Agent James Powell of the Oklahoma State Bureau of Investigation (OSBI), who initially took charge of the murder investigation,[10] testified he found Rogers' delay in reporting Jewell Collins missing to be suspicious.  Furthermore, Rogers lied to him frequently during the investigation: he denied involvement with drugs when he himself was looking for the stolen cocaine in order to obtain a reward;[11] he lied when he denied knowing Hutching; and he lied when he claimed to have never previously seen the van McCullah drove to his car lot on June 4.[12]  The cloud of suspicion over Rogers'

---

[10]Immediately after the Jewel Collins murder, local law enforcement requested the assistance of the OSBI.  Rogers eventually told OSBI Agent Powell he wanted to speak with FBI Agent Collins because he trusted him.  McCullah was informed of Rogers' request in pre-trial discovery. In August 1991, FBI Agent Collins asked OSBI Agent Powell to cede the investigation to the FBI due to the fact its scope was emerging broader than a simple homicide.  Agent Powell agreed.

[11]Agent Powell testified Rogers, in the period leading up to Jewell Collins' murder, told others there were 100 kilograms of cocaine in the stolen truck.

[12]Rogers eventually testified the individual he tentatively identified as McCullah drove the same van into his car lot the previous day.

account further darkened when Agent Powell testified that Rogers was observed earlier in the day on June 4, before McCullah came to the car lot, visiting with the driver of a van matching the description of the van McCullah eventually drove into the car lot later in the day.

Defense counsel revisited the topic of Rogers' status as an FBI informant in cross-examining Agent Powell:

> Q.   Do you know whether or not Avery Rogers has ever been a paid FBI informant?
>
> A.   Not to my knowledge.
>
> Q.   Do you know how it is that he got out of the federal penitentiary early?
>
> A.   I know what he told me.
>
> Q.   Well, we've established that you can't believe a lot that he tells you.

(*Id.* Vol. 10 at 105-06.)

In pretrial proceedings, the Government informed the court and McCullah that it had exceeded its discovery obligation under *Brady*, and it asserted it understood its obligation to continually discover exculpatory material to the defense. With these assurances, McCullah's counsel did not search for *Brady* material in the Government's possession.

**B.    *2255 Record***

In support of his § 2255 motion, McCullah submitted exhibits relative to

Rogers' imprisonment, release, parole and termination of parole for his 1983 federal drug conviction. This evidence tended to establish that Rogers provided useful information to FBI Agent Collins in aid of obtaining early release from prison. McCullah also deposed Agent Collins and Rogers.

Agent Collins testified a member of Rogers' family contacted him during the time Rogers was incarcerated in Oklahoma on his 1983 federal drug conviction. The family member informed Agent Collins that Rogers wanted to meet with him. Agent Collins met with Rogers in about June 1996 and Rogers offered to provide information on criminal activities in eastern Oklahoma. After a brief conversation, Agent Collins concluded Rogers was lying and had nothing of value to offer. "[H]e was wanting to BS me." (2255 R. Vol. 10 at 59.) Agent Collins immediately wrote him off as a potential source.[13] He characterized Rogers' account of the prison meeting in his trial testimony (in which he denied the purpose of Agent Collin's visit was to obtain information from him) as hedging and evasive, but not perjurious.

In his deposition, Rogers acknowledged that during his prison meeting with Agent Collins he offered to provide information on drug-related activities in Oklahoma, although he could not recall any information he provided. He denied he

---

[13]Collins testified Rogers failed to meet his definition of a source, let alone an informant.

-19-

offered to be an FBI informant. Also, he testified he did not work with or provide information to Agent Collins or anyone else connected with law enforcement after his release from prison.

## *V. Discussion*

### *A. Brady and Napue Claims*

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. This is true whether or not the defense requests, specifically or generally, the exculpatory material. *United States v. Agurs,* 427 U.S. 97, 106-08 (1976).[14] Impeachment evidence falls within the *Brady* requirement. *United States v. Bagley,* 473 U.S. 667, 676 (1985). Furthermore, "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process. *Napue,* 360 U.S. at 269. The same is true when the state, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* Once again, the rule applies even if the false evidence goes only to the credibility of the witness, *id.*, and notwithstanding the good or bad faith of the prosecution. *Giglio v.*

---

[14]"[I]f a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*." *Strickler v. Greene,* 527 U.S. 263, 283, n.23 (1999).

*United States,* 405 U.S. 150, 154 (1972).

> In order to establish a *Brady* or *Giglio* [or *Napue*] violation, the defendant bears the burden of establishing (1) that the prosecution suppressed the evidence, (2) that the evidence was favorable to the accused, and (3) that the evidence was material. According to the Supreme Court, the criterion of materiality is met only if there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed to the defense.

*United States v. Gonzalez-Montoya,* 161 F.3d 643, 649 (1998) (quotation marks and citation omitted). The prosecution cannot overcome materiality by demonstrating that there was sufficient evidence to convict absent the undisclosed evidence. *Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995). The gist of materiality is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. *Cf. Agurs,* 427 U.S. at 112 ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record.").

For his *Brady* claim, McCullah alleges the Government withheld the following material exculpatory impeachment evidence from him:

A.     Rogers was an FBI informant. Evidence tending to establish this fact:

1) while incarcerated on a federal drug offense in 1986, in aid of obtaining a sentence reduction, Rogers met with Agent Collins and provided him with information relative to illegal drug activities in

eastern Oklahoma; 2) as a result, his sentence was reduced and he was immediately eligible for parole; 3) shortly thereafter, in 1987, he was paroled.

B.    Even if he was not an FBI informant, Agent Collins considered Rogers a liar.

C.    Rogers violated his parole (scheduled to expire in June 1995) by associating with Norwood Hutching, a convicted felon engaged in continuing criminal activity.  Rogers lied to his probation officer about his association with Hutching.  Furthermore, Agent Collins knew of it and failed to disclose the violation to Rogers' parole officer.

D.    Rogers told his parole officer (who told him to tell Agent Collins) that one Greg Smith, a fugitive featured on the TV program "America's Most Wanted," resembled the person who test-drove vehicles at his car lot as part of the murder plot.

For his *Napue* claim, McCullah alleges the Government knowingly permitted Rogers to give material false testimony (denied being an FBI informant) in order to convict him.  McCullah contends Agent Collins sat with prosecutors during the false testimony and allowed it to stand.

The district court concluded there was insufficient evidence Rogers was an FBI informant and, therefore, there could be no *Brady* or *Napue* violation based on

failure to disclose informant status. Even if Rogers was an FBI informant, the court concluded non-disclosure of this fact was not material. As to McCullah's remaining claims of withheld evidence,[15] the court found that even if true there was again a failure of materiality. We avoid discussion of whether the prosecution suppressed evidence favorable to the accused or permitted perjured testimony to stand, assume it did, and immediately address materiality.

McCullah contends Rogers' identification of him as the person who left the car lot with Jewell Collins was 1) the strongest evidence the Government had implicating him in the murder-for-hire scheme and 2) essential to his conviction. In his view, if only he had been able to cross-examine Rogers about his status as an FBI informant, his claim another person resembled the test-driver who left his lot with Jewell Collins,[16] the fact Agent Collins considered him to be untruthful and

---

[15]The district court concluded that insofar as Rogers' alleged informant status was based on records of his parole for his 1983 conviction, McCullah could have accessed this material through discovery. Implicit in this conclusion is the view that parole materials relative to Rogers' imprisonment, release, parole and termination of parole for his 1983 drug conviction were not subject to *Brady* disclosure. *See Strickler,* 527 U.S. at 281 ("In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf in this case*, including the police." (quotation marks omitted) (emphasis added)). McCullah contends that Rogers' parole materials were subject to *Brady* disclosure. Because we decide the appeal on the basis of materiality, we do not reach the question whether the U.S. Parole Commission, in supervising Rogers' parole in 1991 (Rogers remained on parole for his 1983 federal conviction until 1994), was acting on the Government's behalf such that its records were subject to *Brady* disclosure.

[16]McCullah claims in his brief that Rogers had previously identified one Greg Smith as the person who came to his car lot and left with Jewell Collins. This overstates

violations of his parole status that were known to the Government and overlooked, he would have destroyed Rogers as a disinterested and credible witness, undermined the tenuous testimony of Wiscowiche and Mendoza and won an acquittal. The persuasiveness of his argument is in inverse proportion to the degree to which it overstates the effect of Rogers' testimony.

Turning first to McCullah's argument that Rogers' testimony was the strongest evidence the Government had to implicate him in the murder-for-hire scheme, this is plainly not so. We find it neither necessary nor productive to recount at length the abundant evidence Wiscowiche and Mendoza provided to implicate McCullah in the planning and execution of the murder scheme. Apart from their testimony recounting McCullah's intimate involvement in every step of the plan, each, without hesitation, positively identified McCullah as the person who left the lake house in the crew's van en route to Rogers' car lot on the day of the killing. Mendoza testified McCullah drove to the ambush site with the man later

---

the evidence, which comes from a chronological contact entry Rogers' parole officer made in Rogers' file on July 15, 1991:

> Avery telephoned the office today and [said] that they were watching America' [sic] Most Wanted and it was Greg Smith who is a fugitive, 37 years old, that shot a cop and a tag agent up north of Tulsa. Sure *looked like* the guy that was out there test driving. He wanted me to see if I could get some pictures *so he could identify the guy*.

(2255 R. Vol. 3, Docket Entry 27, Ex. 12 at 12) (emphasis added.)

identified as Jewell Collins, stopped, alighted from the driver's seat, quickly occupied the trailing car and escaped. Meanwhile, Poncho alighted from the trailing car, murdered Jewell Collins, joined Mendoza and escaped. While Wiscowiche and Mendoza positively identified McCullah, Rogers' identification of him was tentative. This undercuts McCullah's argument the Government suppressed evidence and abided perjury in order to obtain convincing identification testimony from Rogers. If anything, Rogers' identification was the weakest arrow in the Government's quiver.

McCullah's argument that Rogers' identification of him was essential to his conviction rests upon twin propositions: a) the testimony of Wiscowiche and Mendoza was tenuous and depended on the corroboration of Rogers, whom the Government presented as disinterested and credible, and b) Rogers was not a disinterested or credible witness. Neither proposition succeeds.

In an effort to diminish the impact of the damning testimony Wiscowiche and Mendoza gave of McCullah's involvement in the planning and execution of the murder scheme, defense counsel effectively cross-examined them on their criminal records and arrangements they had with the Government to secure their testimony. Although it is impossible to measure the degree to which counsel succeeded, we note the testimony of the two confederates was consistent, overwhelming and convincing. To be sure, these are men of checkered pasts who were themselves

-25-

heavily involved in the murder scheme. However, this is true of many successful drug prosecutions. As those who practice regularly in the federal courts well know, when drug organizations are uncovered it is common to witness a "race to the courthouse" by the wrongdoers in an effort to strike an early agreement with the Government to protect themselves. In these agreements, the consideration exchanged typically involves a willingness to testify for the Government. To assure the jury properly weighed the evident self-interest of Wiscowiche and Mendoza, the trial court twice instructed it to approach their testimony with caution and scrutiny. Even discounting their testimony for rigorous cross-examination and the acidic effect of the curative instructions, still we conclude it was resilient and convincing. It was not, as McCullah suggests, either tenuous or in need of an alleged bolstering effect from Rogers' testimony.

We finally turn to whether the Government presented Rogers as a disinterested and credible witness and whether in fact he was one. The answer is "no" on both counts. The Government began its examination of Rogers by eliciting his prior felony history and his imprisonment for drug distribution. The Government, not defense counsel, raised the spectre of Rogers' status as an FBI informant. Trial counsel for one of McCullah's co-defendants cross-examined Rogers with some vigor with respect to his prison meeting with Agent Collins. At first, Rogers denied ever having met with Agent Collins in prison. He then admitted

to the prison meeting but denied its purpose was to provide information. For reasons not apparent, McCullah's counsel declined to cross-examine either Rogers or Agent Collins on the prison meeting even though cross-examination of Agent Powell plainly suggested Rogers' exchange of information was the quid pro quo for his early release. This failure to cross-examine, standing alone, diminishes the effect McCullah now argues we ought to give Rogers' withheld relationship with Agent Collins.

If not an outright prevaricator, Rogers demonstrated his skill on the witness stand at self-serving obfuscation. Surely this was not lost on the jury. After first denying he was searching for the cocaine-laden truck with any purpose other than to help out a friend, he admitted to understanding Hutching held out a reward for its recovery. While pretending to have no idea of its hidden cargo, Agent Powell testified Rogers told others the truck was laden with 100 kilograms of cocaine. Agent Powell also testified to a series of lies Rogers told in the early stages of the investigation, in particular his denial of an association with Hutching. While Rogers tried to minimize this association, surely the jury took note of evidence he had telephone communication (or attempted communication) with Hutching forty-six times between April 15 and June 5, 1991. At first denying he was familiar with Hutching's financial practices, Rogers admitted to his knowledge only after the Government impeached him with his own grand jury testimony.

Rogers' credibility was also undermined by testimony tending to suggest he met with a member of the lake house gang on the morning of and prior to McCullah's second fateful visit to his car lot. The distinct impression left by this dark testimony was that Rogers arranged with the killers for Jewell Collins to substitute for him on the death ride. This is hardly the profile of a witness groomed to perfection by the Government or a witness whose testimony carried the day only because of suppressed evidence of his prior relationship with Agent Collins, the fact Agent Collins considered him a liar, his violation of parole and his claim another individual resembled the man who left his car lot with the murder victim.

With or without his alleged perjury or other suppressed evidence, it is unlikely the jury would have relied on Rogers in order to believe the testimony of Wiscowiche and Mendoza. Nor are we able to conclude that if the jury believed the Government deliberately allowed Rogers' alleged perjury to stand it would have held such a connivance against the testimony of McCullah's confederates. If anything, the evidence demonstrates Rogers swam in the same lagoon with the killers and the jury likely put little credence in him. No doubt it had to pick and choose truth and falsity from his testimony. Therefore, we conclude Roger's testimony was neither the strongest the Government offered to prove McCullah's identity nor essential to his conviction. The suppressed evidence, because it would have added little to the jury's view of Rogers, could not "reasonably be taken to put

the whole case in such a different light as to undermine confidence in the verdict."

*Kyles,* 514 U.S. at 435. There being a failure of materiality, the district court correctly concluded there was no *Brady* or *Napue* violation.

B.    *Apprendi* **Claim (COA)**

McCullah contends his sentence of life imprisonment on Count 1 for drug conspiracy, pursuant to 21 U.S.C. § 846(b)(1)(A), depended on a finding by the sentencing judge of the type and amount of drugs involved in the conspiracy.[17] He argues this violates the rule of *Apprendi* that a jury must find such sentence enhancing facts by proof beyond a reasonable doubt. According to McCullah, absent a jury finding the type or amount of drug involved in the conspiracy, he ought to have been sentenced under 21 U.S.C. § 841(b)(1)(D) (permitting a sentence of no more than five years if the conviction involves less than fifty kilograms of marijuana).

---

[17]Count 1 of a superseding indictment charged McCullah with conspiracy to knowingly and intentionally possess with intent to distribute and to knowingly and intentionally distribute in excess of five kilograms of cocaine and in excess of 100 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1). The jury convicted on Count 1 without a specific finding as to the type (cocaine or marijuana) or the amount of drug involved. The law provides a penalty of ten years to life if a conviction involves five kilograms or more of cocaine, a penalty of five to forty years if the conviction involves 500 grams or more of cocaine or 100 kilograms or more of marijuana, a penalty of no more than twenty years if no amount of either drug is specified and a penalty of no more than five years if the conviction involves less than fifty kilograms of marijuana. 21 U.S.C. § 841(b)(1)(A)(ii)(II),(B)(vii), (C) and (D). The district court sentenced on the basis of a conviction involving five kilograms or more of cocaine (the only combination of type and amount of drug supporting a life sentence).

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490. *See also Jones v. United States,* 526 U.S. 227, 243 n.6 (1999) (same, construing federal statute). We settled the question of the retroactivity of *Apprendi* on collateral review in *United States v. Mora*:

> *Apprendi* clarifies that certain questions that were previously thought to be properly determined by the court must now be proved to a jury beyond a reasonable doubt. While this rule arguably increases the accuracy of convictions, it is a rule that simply shifts the fact-finding duties from an impartial judge to a jury.

293 F.3d 1213, 1219 (10th Cir. 2002) (quotation marks omitted). "*Apprendi* is not a watershed decision and hence is not retroactively applicable to initial habeas petitions."[18] *Id.* Our decision foreshadowed a similar ruling by the Supreme Court in *Schriro v. Summerlin* where the Court held its decision in *Ring v. Arizona,* 536 U.S. 584, 609 (2002) (applying *Apprendi* in death penalty context) was not retroactive to cases on collateral review. 124 S.Ct. 2519, 2526 (2004). With this

---

[18]Although this is not a case involving a challenge to the federal sentencing guidelines, we note we have previously decided that *Blakely v. Washington,* 124 S.Ct. 2531, 2536-38 (2004), a case which applied *Apprendi* and invalidated Washington's sentencing guidelines scheme as violative of the Sixth Amendment, and which was subsequently extended to the federal sentencing guidelines, *see United States v. Booker,* 125 S.Ct. 738, 746 (2005), is not retroactively applicable to cases on collateral review which became final before *Blakely* was decided on June 24, 2004. *See United States v. Price,* 400 F.3d 844 (10th Cir. 2005).

history it is clear that McCullah has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). About this jurists of reason could not debate. *See Miller-El,* 537 U.S. at 327.

## VI. Conclusion

Accordingly, we **VACATE** the district court's order denying McCullah's motion for new trial because it lacked jurisdiction to decide the motion, **AFFIRM** the court's denial of relief on the *Brady* and *Napue* claims and **DENY** a COA on the *Apprendi* claim.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge